582 So.2d 203 (1991)
Clarence and Peggy McLAUGHLIN
v.
FIREMAN'S FUND INSURANCE COMPANY, et al.
No. 86 CA 1636.
Court of Appeal of Louisiana, First Circuit.
February 25, 1991.
On Rehearing June 5, 1991.
Writ Denied October 4, 1991.
*205 Byard Edwards, Jr., Ponchatoula, for plaintiffs-appellants Clarence and Peggy McLaughlin.
Richard S. Vale, Metairie, for defendants Howard Glasper, Jr., William McNabb and Fireman's Fund Ins., appellee.
Frank Gremillion and William Doran, Jr., Baton Rouge, for Dept. of Transp. and Development, appellee.
Before COVINGTON, C.J., and LOTTINGER, WATKINS, SHORTESS, CARTER, SAVOIE, LANIER, CRAIN and FOIL, JJ.,[*] and VIAL LEMMON[**], J. Pro Tem.
CRAIN, Judge.
This is a suit for damages in tort arising out of a vehicle accident which resulted in a fatality. The parents of the deceased driver claim damages for wrongful death. After a trial on the merits, the jury found the defendant driver was not negligent. In accordance with the jury's verdict, the trial court rendered judgment in favor of the defendants, dismissing plaintiffs' demands. Plaintiffs took a devolutive appeal to this court.
This court, in an unpublished opinion, affirmed with a dissent. The majority held that the jury verdict that the defendant driver was not negligent was not manifestly erroneous and declined to rule on the plaintiffs' assignments of error concerning the admission of the results of a blood alcohol test of the deceased because it pertained to the issue of the deceased's comparative negligence and was not relevant to the defendant driver's fault. The dissenter disagreed with the majority's view that the results of the decedent's blood alcohol test were not relevant to the fault of the defendant driver and expressed the opinion that the evidence was insufficient to establish by a preponderance of the evidence that the blood tested was that of the decedent.
On application of the plaintiffs, the Louisiana Supreme Court peremptorily granted a supervisory writ with the following per curiam:
The court of appeal declined to address the issue of the admissibility of the results of plaintiff's second blood alcohol test on the basis that the results were only relevant to plaintiff's comparative negligence in this intersectional collision. Because there was a reasonable basis for the jury to find defendant (who was faced with a stop sign at the intersection) at least concurrently at fault, one cannot reasonably conclude that the admission of the test results, if erroneous, could not have affected the jury's finding that defendant was totally free of fault. Accordingly, the judgment of the court of appeal is set aside, and the case is remanded to the court of appeal to rule upon the admissibility of the test results and to reconsider the fault of the parties in the light of that ruling. McLaughlin v. Fireman's Fund Insurance Company, 533 So.2d 340 (La.1988).
*206 On remand this court held that the plaintiffs failed to properly preserve their chain of custody objection for appellate review and ruled that it was unnecessary to rule on the assignments of error relating to the admissibility of the decedent's blood alcohol test. This court also held the jury verdict finding that the defendant driver was not negligent was not manifestly erroneous and affirmed the judgment of the trial court. This court again affirmed with a dissent. McLaughlin v. Fireman's Fund Insurance Company, 549 So.2d 327 (La. App. 1st Cir.1989). The dissent was of the opinion that (1) the chain of custody objection was properly preserved, (2) the evidence was insufficient to establish by a preponderance of the evidence that the blood tested was that of the decedent and the blood alcohol analysis results were improperly admitted into evidence, (3) this error in admitting evidence was prejudicial and interdicted the jury verdict on the defendant driver's fault, (4) a de novo review of the evidence showed that the defendant driver was negligent, (5) there was no admissible evidence in the record to show that the decedent driver was intoxicated, and (6) the plaintiffs should recover $150,000 each.
The plaintiffs again applied to the Louisiana Supreme Court for supervisory relief. The Louisiana Supreme Court again peremptorily granted a supervisory writ with the following per curiam:
Granted. Judgment of the court of appeal is reversed. We find that the chain-of-custody objection was properly preserved for appellate review. The case is remanded to the court of appeal to determine whether defendants laid a proper foundation for admission of the blood-alcohol test results and to reconsider the apportionment of fault between the parties. McLaughlin v. Fireman's Fund Insurance Company, 551 So.2d 622 (La. 1989).

BASIC FACTS
On April 10, 1983, at approximately 7:30 p.m., Kirk D. McLaughlin was driving his 1978 Chevrolet Monza in a westerly direction on Louisiana Highway 1040 (Old Baton Rouge Highway) in the vicinity of the Interstate 55 (I-55) overpass in Tangipahoa Parish, Louisiana. The I-55 overpass is approximately 900 feet east of the intersection of La. 1040 and Stein Road. The posted speed limit on La. 1040 is 55 miles per hour. At this same time, Howard Glasper was operating an 18-wheel tractor-trailer rig (truck) owned by Hammond Sandblasting, Inc. in a southerly direction on Stein Road. Glasper stopped the truck at the stop sign at the intersection of La. 1040 and Stein Road. Glasper then entered the intersection with the intent to turn left to proceed in an easterly direction on La. 1040. As Glasper was making this turning maneuver, the front of McLaughlin's vehicle struck the left rear wheels of the trailer and McLaughlin was killed. The point of maximum impact between the two vehicles was near the centerline of the roadway in the eastbound lane of La. 1040.
Kirk McLaughlin was survived by his parents, Clarence "Red" McLaughlin and Peggy Crisp McLaughlin. Glasper was employed by William McNabb d/b/a B-Line Truck Services and was in the scope and course of his employment at the time of the accident. The insurer of Glasper, McNabb and Hammond Sandblasting, Inc. was Fireman's Fund Insurance Company (Fireman's Fund).

ADMISSIBILITY OF THE BLOOD ALCOHOL TEST
The plaintiffs assert the blood alcohol test results were improperly admitted into evidence with the following rationale:
In McLaughlin herein there were two alleged blood samples drawn from the deceased and the testimony as to their handling is a muddle of inconsistencies, contradictions and unknowns. The coroner, Dr. Maxwell, testified both that he drew one blood sample at the accident scene and that he (contradictory) drew two samples at the autopsy. He may have drawn three samples. The State Police got one sample but it was rendered useless by its improper handling. Dr. Maxwell testified that he gave one sample to someone in the autopsy lab *207 with him but he does not know who it was. That that unknown person identified the sample (but curiously did not identify himself). There is not further evidence either documentary or testimonily as to who, when or where the evidence was handled until the medicine technologist received it from some unknown person and performed his tests. His testimony was that he didn't even know if the sample was in a sealed or unsealed kit.
The plaintiffs cite Bufkin v. Mid-American Indemnity Company, 528 So.2d 589 (La.App. 2d Cir.1988), and the courts of appeal cases cited therein, as authority.
The defendants assert "the procedures followed and testimony offered with regard to the custody of the blood samples in this case were sufficient to support the admissibility of the blood tests at issue," citing State v. Turner, 392 So.2d 436 (La.1980); State v. Flood, 301 So.2d 637 (La.1974); State v. Dotson, 260 La. 471, 256 So.2d 594 (1971); State v. Coleman, 254 La. 264, 223 So.2d 402 (1969); and Ballou v. R.E. Henri Studios, Inc., 656 F.2d 1147 (5th Cir.1981) (citing Federal Rule of Evidence 901).
The admissibility of evidence is a question of law determined by the court. See cases cited in Comment (a) for La.C.E. art. 104. When factual questions must be decided to determine the admissibility of evidence, the court should follow the preponderance of evidence standard, unless a special rule of law requires a different standard. See authorities cited in Comment (c) for La.C.E. art. 104.
This is a civil case, and the special rules of La.R.S. 32:661 et seq. do not apply. La.R.S. 32:662(C); Pereira Enterprises, Inc. v. Soileau, 551 So.2d 39 (La.App. 1st Cir.1989). However, a litigant in a civil action may prove intoxication by introducing evidence of a person's blood alcohol content and expert testimony interpreting the effects of such a level (content) on the person's ability to operate a motor vehicle. Parker v. Kroger's, Inc., 394 So.2d 1178 (La.1981); Clay v. Bituminous Casualty Corporation, 401 So.2d 1257 (La.App. 1st Cir.), writ denied, 409 So.2d 616 (La.1981). What constitutes a proper foundation for the admissibility of test results of a blood sample in a civil case is found in Allemand v. Zip's Trucking Co., 552 So.2d 1023 (La. App. 1st Cir.), writ denied, 558 So.2d 569 (La.1990). There it was stated that:
The requirements for the introduction of a blood test analysis are very stringent; the party seeking to introduce such evidence must first lay a proper foundation for its admission. Pearce v. Gunter, 238 So.2d 534 (La.App. 3rd Cir.), application not considered, 256 La. 888, 239 So.2d 543 (La.1970). This predicate must connect the specimen with its source, show that it was properly taken by an authorized person, properly labeled and preserved, properly transported for analysis and properly tested. Pearce v. Gunter, 238 So.2d at 537.
552 So.2d at 1026. See also Wells v. State Farm Mutual Automobile Ins. Co., 573 So.2d 223 (La.App. 1st Cir.1990).
The confusion in this case stems from the fact that three blood samples were taken. Two were sent to the state police and one of them was not properly preserved. However, a third sample was sent to TPL and the result of this sample was admitted in evidence. With reference to this sample the evidence shows that the coroner of Tangipahoa Parish, Dr. Ralph Maxwell, drew the TPL sample. He used an intracardiac needle to remove the TPL blood sample from McLaughlin's heart. He testified that he placed the blood in a Beckdin, Dickinson Vacutainer forensic blood collection kit vial. This vial contained potassium oxalate to keep the blood from coagulating and sodium fluoride to preserve it. The vial was labeled with the date, McLaughlin's name, Dr. Maxwell's name and the Coroner's Office TPL number of 1855. Dr. Maxwell placed the TPL sample in the TPL "collection area" at the Hospital. It is not contested that Dr. Maxwell took the TPL sample. His testimony to that effect is corroborated by the testimony of Captain Keating, Trooper Blunschi, and the records of TPL. Dr. Maxwell's qualifications for drawing the blood are not contested. Dr. Monroe Samuels, a medical *208 doctor qualified as an expert in forensic pathology and toxicology testified Dr. Maxwell removed the blood in the proper manner. The fact that Dr. Maxwell received a report from TPL on its testing of McLaughlin's blood sample is circumstantial evidence that TPL received the McLaughlin blood sample that Dr. Maxwell took.
Stanley S. Chigoy, a medical technologist, testified that TPL dispatched a courier who during his routine day would pick up specimens (blood samples) at Dr. Maxwell's office, or a place specified by him, and the courier would transport the specimen back to TPL for testing. The courier in the instant case was not identified and did not testify. However, this is not necessarily fatal to the admissibility of the evidence. It is gaps in possession of the sample as opposed to lack of evidence pertaining to the taking of the sample and its analysis which result in different language by the courts as to foundation evidence necessary to introduce a sample. Gaps in a chain of custody usually affect the weight of the evidence, not its admissibility, and an unbroken chain of custody is not essential for the admissibility of the evidence as long as the foundation evidence as a whole shows it is more probable than not that the evidence tested was that which was originally taken. State v. Ray, 521 So.2d 582 (La.App. 1st Cir.), writ denied, 525 So.2d 1055 (La.1988). Evidence of custom or routine shows a regular practice of meeting a particular kind of situation with a specific type of conduct. E. Cleary, McCormick's Handbook of the Law of Evidence, § 195, pp. 462-465 (2d ed. 1972). The fact that there is a custom of meeting a particular situation with a specific type of response is circumstantial evidence that on the particular occasion in question, the response was the same. See, for example, State v. Brown, 395 So.2d 1301 (La.1981); Brumfield v. Brumfield, 477 So.2d 1161 (La.App. 1st Cir.), writ denied, 479 So.2d 922 (La.1985); Bonvillain v. Realty Operators, 26 So.2d 25 (La.App. 1st Cir.1946). Thus, La.C.E. art. 406 provides as follows:
Evidence of the habit of a person or of the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice. The evidence may consist of testimony in the form of an opinion or evidence of specific instances of conduct sufficient in number to warrant a finding that the habit existed or that the practice was routine.
Chigoy's testimony on this issue is corroborated by the testimony of Dr. Maxwell, the TPL log book entry (Defendants' Exhibit 9) and Dr. Maxwell's request for analysis form (Defendants' Exhibit 8). Dr. Maxwell testified he drew the blood sample on the night of April 10, 1983. He put the blood in a special container and marked it with (1) the date, (2) his name, (3) McLaughlin's name, and (4) his TPL identification number of 1855. Dr. Maxwell testified he routinely placed the samples in a TPL "collection area" at the Hospital and, in the normal course of events, received a report from TPL, and he received a report from TPL in the instant case. The TPL records show TPL received the blood sample on April 11, 1983 (within 24 hours after it was taken), and the sample had McLaughlin's name and Dr. Maxwell's name and number on it. Chigoy's testimony, together with the testimony of Dr. Maxwell and the TPL records, were sufficient to establish the connexity between the taking of the blood and the testing of the blood by a preponderance of the evidence. See, for example, Lawless v. New Orleans Police Department, 550 So.2d 252 (La.App. 4th Cir.), writ denied, 551 So.2d 1344 (La.1989), Harris v. Browning-Ferris Industries Chemical Services, Inc., 635 F.Supp. 1202 (M.D. La.1986), affirmed, 806 F.2d 259 (1986).
Chigoy testified about how he tested the blood in a gas-liquid chromatograph. He was qualified without objection as an expert in the analysis of blood samples. The plaintiffs did not take issue with the quality of the testing machine or the maintenance of the testing equipment.
*209 Dr. Samuels testified that a chromatograph provides a "state of the art test" and that TPL "observed all of the necessary precautions in order to render a valid answer."
The test result of the TPL sample was admissible.
This assignment of error is without merit.

RECONSIDERATION OF THE FAULT OF THE PARTIES
The plaintiffs assert that Glasper's version of how the accident happened is "physically impossible" and submit various calculations to support this view. They further assert the evidence shows the lights on the trailer were off at the time of the accident and conclude that the accident occurred because the truck pulled out in front of the car, the driver of the car did not see the unlighted trailer, and the driver of the car could not avoid a collision when faced with this unexpected emergency. The defendants respond that the jury determination that McLaughlin was solely at fault is not manifestly erroneous.

McLaughlin's Fault
The defendants presented evidence to show that McLaughlin was at fault in the accident by (1) driving while intoxicated, (2) speeding, and (3) failing to take proper action to avoid the accident.
Evidence tending to show that McLaughlin was intoxicated was introduced throughout the testimony of Trooper Blunschi, Trooper McGlothren, Earle H. Boudreaux, a retired police officer presently employed as a claims manager for two insurance companies, qualified as an expert in accident reconstruction, Dr. Maxwell and Chigoy. The jury's verdict indicates that it accepted this testimony. This factual ruling is not clearly wrong. Driving while intoxicated is a violation of La.R.S. 14:98. Boudreaux gave the opinion that McLaughlin failed to take proper evasive action to avoid the accident. McLaughlin was in a position to see the truck for 900 feet after he topped the I-55 overpass. Boudreaux opined McLaughlin should have applied his brakes to stop his vehicle and/or steered to the right to pass around the truck. Boudreaux was of the opinion that McLaughlin did not apply his brakes because there were no skid marks in his lane of travel. Trooper Blunschi testified that brakes could be applied on a vehicle and no skid marks left. Trooper McGlothren and Boudreaux testified there was sufficient room on the unblocked portion of La. 1040 and the shoulder of the roadway for the McLaughlin vehicle to pass around the truck. Paul Knight testified the truck and trailer blocked both lanes of La. 1040 and it was impossible to pass the truck and trailer on the right because of a steep ditch. Troy Milton testified there was not enough room to pass around the truck and trailer on the right. The jury could have accepted the testimony of Boudreaux and Trooper McGlothren and concluded McLaughlin did not attempt to apply his brakes (or did not do so hard enough) and steered to the left, instead of to the right where he could have avoided a collision with the truck, and that this failure to take proper evasive action was negligence. Such a factual determination is not clearly wrong.

Glasper's Fault
We have been ordered by the Louisiana Supreme Court to "reconsider the apportionment of fault between the parties." This directive was not made contingent on how we ruled on "whether defendants laid a proper foundation for admission of the blood-alcohol test results." Since the trial court jury apportioned the fault herein as 0% to Glasper, and, thus, 100% to McLaughlin, a reconsideration means we must consider an apportionment of different percentages and that the jury's apportionment was clearly wrong. This further means that some fault must be attributed to Glasper.
The plaintiffs presented evidence to show that Glasper was operating a truck without adequate lights and that Glasper failed to yield the right-of-way to the McLaughlin vehicle.
*210 Paul Knight testified he observed lights on the cab of the tractor but did not observe lights burning on the trailer. However, he conceded he could not deny that the lights were on. Mr. McLaughlin testified that after the accident he went to look at the trailer and observed that the wires on the trailer were rusted off of the light fixtures. Trooper McGlothren's accident report indicates that no defects were observed in the truck's condition and that the vehicle's headlights were on. Glasper testified that prior to the accident he did a routine operational check of the truck and the lights were in proper working order. Boudreaux testified on April 18, 1983, he examined the lights on the tractor and trailer and there was nothing wrong with them. McNabb testified he went to the scene of the accident shortly after it occurred, personally inspected the lights of the tractor and trailer, and found the lights were "all burning." The jury's verdict indicates it accepted the testimony of Glasper, Boudreaux and McNabb and rejected that of Knight and Mr. McLaughlin. This factual finding is not clearly wrong.
The answer to the question of whether Glasper failed to yield the right-of-way is one where we find the jury to be clearly wrong. The main evidence on this issue is the testimony of Glasper, Boudreaux and Trooper Blunschi. The rules applicable to reviewing this testimony are set forth in Rosell v. Esco, 549 So.2d 840, 844-845 (La.1989), as follows:
It is well settled that a court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong," and where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable.... The appellate review of fact is not completed by reading only so much of the record as will reveal a reasonable factual basis for the finding in the trial court, but if the trial court or jury findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong.... In applying the manifestly erroneous-clearly wrong standard to the findings below, appellate courts must constantly have in mind that their initial review function is not to decide factual issues de novo.2 ...
When findings are based on determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard demands great deference to the trier of fact's findings; for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said.... Where documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness's story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination.... But where such factors are not present, and a factfinder's finding is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong.
The Louisiana Constitution provides that the appellate jurisdiction of a court of appeal extends to law and facts. La. Const. 1974, Art. V Sec. 10(B). This provision, resulting from Louisiana's history as a civilian jurisdiction, has been interpreted as giving an appellate court the power to decide factual issues de novo. The exercise of this power is limited, however, by the jurisprudential rule of practice that a trial court's factual finding will not be upset unless it is manifestly erroneous or clearly wrong. Nevertheless, when the court of appeal finds that a *211 reversible error of law or manifest error of material fact was made in the trial court, it is required to redetermine the facts de novo from the entire record and render a judgment on the merits.
Where the testimony of expert witnesses differ, it is the responsibility of the trier of fact to determine which evidence is the most credible. Sistler v. Liberty Mutual Insurance Company, 558 So.2d 1106 (La. 1990). In the instant case, obviously the jury found Boudreaux's testimony more credible than Trooper Blunschi's testimony. The rule that questions of credibility are for the trier of fact applies to evaluations of expert testimony, unless the stated reasons of the expert are patently unsound. Lirette v. State Farm Insurance Company, 563 So.2d 850 (La.1990).
Glasper testified he stopped at the stop sign on the north side of the La. 1040-Stein road intersection. This stop sign is located 36 feet north of the north edge of the La. 1040 roadway. The length of the truck (tractor and trailer) is 46 feet (per the Boudreaux scale drawing). Glasper testified that after he ascertained the roadway was clear, he commenced to make a left turn across the intersection, and, when the tractor of the truck was in the eastbound lane of La. 1040, he observed the McLaughlin vehicle coming over the I-55 overpass, which was approximately 900 feet away. At this point in time, the front of the truck had traveled approximately 58 feet (36 feet from the stop sign to the roadway, 12 feet across the westbound lane, and 10 feet from the front to the rear of the tractor). Glasper accelerated and pulled left (eastward) across the intersection and onto the south shoulder of La. 1040. At the point where the truck came to rest on the south shoulder, the front of the truck was located 67 feet east of the Stein Road edge of the intersection. The truck crossed the intersection diagonally rather than at a right angle. Thus, it would appear that the front of the truck traveled approximately 135 feet from the stop sign to its final resting position (36 feet from the stop sign to the north edge of the La. 1040 roadway, 32 feet diagonally across the intersection, and 67 feet to final resting position).
If it is assumed that the McLaughlin vehicle was traveling 65 miles per hour (as Boudreaux stated and apparently what the jury believed), it would have taken 9.5 seconds for it to travel the 900 feet from the I-55 overpass to the point of impact (65 miles per hour is 95 feet per second and 900 feet divided by 95 feet per second is 9.5 seconds). This assumes that McLaughlin did not take his foot from the accelerator and/or attempt to brake the vehicle.
Trooper Blunschi testified that it should have taken the truck 6 or 7 seconds to leave the stop sign and clear the eastbound lane. Thus, Blunschi opined it was impossible for the accident to happen as Glasper testified because if Glasper could clear the westbound lane 7 seconds after leaving the stop sign, and Glasper had 9.5 seconds to clear the eastbound lane with the truck after first observing the McLaughlin vehicle, then there would have been no contact between the vehicles. From this, Trooper Blunschi opined that Glasper must have pulled out in front of McLaughlin when McLaughlin was in Glasper's range of vision and McLaughlin was unable to avoid the accident, albeit due in some degree to McLaughlin's intoxication. The jury's failure to find that Glasper did not yield the right of way was clearly wrong.
Apportionment of fault between parties litigant involves weighing their conduct in light of five factors: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. Kimble v. Wal-Mart Stores, Inc., 539 So.2d 1212 (La.1989); Watson v. State Farm Fire and Casualty Insurance Co., 469 So.2d 967 (La.1985); Day v. South Line Equipment Company, 551 So.2d 774 (La.App. 1st Cir.), writ denied, 553 So.2d 474 (La.1989). The fault of *212 McLaughlin was (1) driving while intoxicated, and (2) failure to take the proper evasive actions of braking his vehicle and steering to the right. The fault of Glasper is failing to yield the right of way. After weighing the conduct of the parties in light of the five factors enumerated above, we conclude that the fault should be apportioned 50% to McLaughlin and 50% to Glasper.

QUANTUM
Because the jury found no fault by Glasper, it did not reach the issue of quantum. The evidence shows the McLaughlins were a close, loving family. Kirk lived with his parents and helped with the family chicken farm when he came home after work in the evening. Accordingly, we fix damages for the loss of their son at $150,000 for Mr. McLaughlin and $150,000 for Mrs. McLaughlin, each to be reduced by 50%. See, for example, Tabor v. Doctors Memorial Hospital, 563 So.2d 233 (La. 1990); Llorence v. State, Department of Transportation and Development, 558 So.2d 320 (La.App. 3rd Cir.1990); Acy v. Aetna Casualty & Surety Co., 499 So.2d 262 (La.App. 1st Cir.1986), writ denied, 503 So.2d 16 (La.1987).

DECREE
For the foregoing reasons, the judgment of the trial court is reversed, and judgment is rendered in favor of Mr. and Mrs. McLaughlin and against Glasper, McNabb and Fireman's Fund, in solido, in the amount of $150,000 for each plaintiff, each to be reduced by 50%, together with legal interest thereon from date of judicial demand until paid. All costs are assessed in accordance with the parties' percentages of fault.
REVERSED AND RENDERED.
LOTTINGER, J., concurs in part and dissents in part and assigns written reasons.
SHORTESS, J., concurs in part and dissents in part with reasons.
CARTER, J., concurs in part and dissents in part for reasons assigned by SHORTESS, J.
LANIER, J., concurs in part and dissents in part and assigns reasons.
COVINGTON, C.J., concurs in part, dissents, and with LANIER, J., assigns reasons.
MARY ANN VIAL LEMMON, J. Pro Term., concurs in part and dissents in part and assigns reasons.
FOIL, J., concurs in part and dissents in part and assigns reasons.
LOTTINGER, Judge, concurring in part and dissenting in part.
I respectfully concur in part and dissent in part for the reasons assigned by Vial Lemmon, J., except that I believe a review of the jury's finding of fault is appropriate. I would affirm the finding of fault by the jury.
SHORTESS, Judge, concurring in part and dissenting in part.
The first time this case came before this court, I dissented from the majority's unpublished opinion because it seemed clear, from the record, that the only evidence of McLaughlin's intoxication was the blood test and that Fireman's Fund failed to offer any credible testimony as to how and when this blood was drawn. The second time around this case came before a different panel and Judge Burrell J. Carter dissented from the majority opinion for the very same reason. See McLaughlin v. Fireman's Fund, 549 So.2d 327, 347 (La. App. 1st Cir.), reversed and remanded, 551 So.2d 622 (La.1989). While I concur with the majority insofar as it accepts applicability of the standard for blood test admissibility articulated most recently by this court en banc in Wells v. State Farm Insurance Co., 573 So.2d 223, I must dissent in part based upon my review of the trial transcript. I would, using the Wells test, find the blood test inconclusive and find Glasper entirely at fault. The evidence shows there were several vials of blood drawn by more than one person. One vial which reached the state police lab was unusable due to exposure to heat; another *213 sample reached the pathology lab with Coroner Maxwell's billing number on it. This is essentially all of the evidence regarding the vial of blood with McLaughlin's name and Maxwell's billing number. Cf. Lapoint v. Breaux, 395 So.2d 1377 (La.App. 1st Cir.), writ denied, 399 So.2d 611 (La.1981) (where there was nothing but the label on the blood sample to connect it to the coroner who drew the blood, and this court held that the label was insufficient to establish a chain of custody).
Maxwell's recollection of the events of the late evening hours of April 10, 1983, is patently sparse; his testimony at trial was evasive and conflictive and simply does not establish where and how the blood in the vial which was eventually tested was taken. There is evidence in the record which suggests at least one and possibly all of the vials drawn by Maxwell were obtained by a blind injection through the chest wall into the chest cavity. There is no autopsy report in the record. Dr. Samuels, defendant's expert, testified the proper procedure is to draw the blood during the autopsy by injection directly into the heart because the blind procedure can lead to inaccurate positive results if there is alcohol from the stomach in the chest cavity.
The majority erroneously reasons that evidence which establishes it was more probable than not that the blood was McLaughlin's satisfies the inquiry, and that doubts as to the circumstances of the taking of the blood can properly be made to affect the weight of the evidence. Firstly, there are more significant defects in this piece of evidence than "gaps in possession of the sample." See State v. Ray, 521 So.2d 582 (La.App. 1st Cir.), writ denied, 525 So.2d 1055. The majority relies on this line of criminal cases which hold that gaps in the chain of custody affect the weight without mention than none involve a blood alcohol test. Ray involved a substance thought by an arresting officer to be amphetamines which laboratory testing revealed not to be a controlled substance. See also State v. Brown, 337 So.2d 484 (La.1976) (involving marijuana); State v. Bridgewater, 450 So.2d 1075 (La.App. 1st Cir.1984) (involving marijuana); State v. Flood, 301 So.2d 637 (La.1974) (involving a blood test to determine the presence of arsenic, which blood does not manufacture or otherwise contain if not properly drawn and preserved); State v. Mitchell, 311 So.2d 888 (La.1975) (involving LSD); State v. Davis, 411 So.2d 434 (La.1982) (involving marijuana and cocaine).
The purpose of a chain of custody predicate is to lay a foundation for admission of the evidence in the first instance. See LSA-C.E. art. 104. Moreover, cases which address the issue in the context of tests of controlled substances or tests for substances in blood other than alcohol are inapplicable here because the concern addressed by the chain of custody rule in that context is not that the evidence must have been properly taken and preserved, but that the evidence is the same and has not been tampered with. Improperly drawn and handled blood can inaccurately reflect a high alcohol concentration. For this reason blood alcohol tests are sui generis. Failure to satisfy the stringent chain of custody requirements articulated by this court in Lapoint and, more recently, in Allemand v. Zip's Trucking Co., 552 So.2d 1023 (La.App. 1st Cir.1989), writ denied, 558 So.2d 569 (La.1990), cannot be made to apply to the weight of the evidence.
Absent the blood test, there is no evidence of intoxication other than Trooper McGlothern's testimony that he smelled alcohol within the automobile. McLaughlin appears to have died instantly and in any event was not breathing when McGlothern says he smelled the alcohol. There was no evidence of spilled or empty containers in the automobile. The photographs of the scene depict a heavily damaged automobile with its spilled fluids covering a large area surrounding the automobile. No reasonable fact finder could accept this testimony as evidence of McLaughlin's intoxication. Without this inference of intoxication, there is simply no evidence of McLaughlin's fault, and Glasper's testimony as to McLaughlin's automobile swerving to and fro, taken as part of his testimony in its entirety, becomes conspicuously self-serving.
*214 The majority erroneously states the crash occurred east of the center line (in Glasper's lane of travel). The post-accident photographs show McLaughlin's automobile straddling the center line, at an angle consistent with having been dragged some distance eastward after the collision.
I can find no evidence of fault on McLaughlin's part. Glasper was totally to blamehe failed to yield. For these reasons, I concur in part and dissent in part.
COVINGTON, C.J., and LANIER, J., concurring in part and dissenting in part.
LANIER, Judge.
We concur with the holding that the blood alcohol test result was admissible. We dissent from the holdings that (1) the Louisiana Supreme Court remand order requires (mandates) that this court find fault on the part of the defendant driver (Glasper), and (2) the jury was manifestly erroneous (clearly wrong) in finding that the defendant driver (Glasper) was without fault.

TESTIMONY OF THE WITNESSES
Reviewing the testimony of the witnesses in the order presented by the parties is helpful in analyzing and deciding the issues in this case.

The Case of the Plaintiffs
The first witness presented by the plaintiffs was Dr. Merlin H. Allen, a medical doctor specializing in family medicine. Dr. Allen testified Kirk McLaughlin consulted him on April 8, 1983, complaining of severe abdominal pains and nausea. Dr. Allen had him admitted that day to the Seventh Ward General Hospital (Hospital) in Hammond, Louisiana, for diagnostic studies. McLaughlin's condition was diagnosed as moderate pylorospasms with an active distal antral ulcer with gastritis and duodenitis. No actual ulceration was demonstrated radiographically. McLaughlin was placed on Librax, Maalox and Tagamet and advised to (1) stop chewing tobacco, (2) eat three meals per day, (3) not eat highly seasoned food, and (4) not drink "any large quantities of alcohol". Dr. Allen testified McLaughlin was released from the Hospital on April 10, 1983.
Troy Milton testified that on April 10, 1983, he was traveling on the Old Baton Rouge Highway (La. 1040) toward Hammond (easterly) when he came upon the accident.[1] The truck and trailer blocked all of the eastbound lane of La. 1040 and about half of the westbound lane. There was not enough room for a car to pass around the trailer in the westbound lane. Milton had known McLaughlin for about 20 years.
Paul Knight testified he lived about a block away from the Stein Road-La. 1040 intersection. On the night of April 10, 1983, he was at home, heard a loud noise and went to the intersection to see what happened. He testified the truck and trailer were blocking both lanes of travel and it was impossible to pass on the westbound shoulder because of a steep ditch. He observed lights burning on the cab of the tractor and did not observe any lights burning on the trailer, but he conceded that "I can't deny they were on because I don't know."
Captain Donald A. Keating, the Commander of Troop L of the Louisiana State Police, testified the accident was investigated by his troop. He received a letter from McLaughlin's parents complaining about the fact that the initial State Police report did not charge Glasper with a violation. Keating reviewed the accident report and decided to investigate further. He asked Trooper John E. Blunschi, III, an accident reconstructionist from Troop E, to reinvestigate the case. Blunschi filed a supplemental report dated October 25, 1983. During cross-examination, Keating gave the following testimony:

*215 Q There was a blood alcohol sample taken in this accident investigation, was there not?
A As I understood, there were two.
Q Two, that is right.
. . . . .
Q Why were there two blood samples taken, Captain Keating?
A In a fatality accident, we request that blood samples be taken. Apparently the coroner took a second blood sample, and I am going by the fact that I received some information that he had run one also. Now that happens fairly frequently in some areas, and in other areas, they only take one.
. . . . .
Q Let's talk aboutso the second one now is the one that the coroner took and had analyzed?
A I have no idea which one he took, first or second, or even who took it. All I have information is that we had one that was sent to our lab, and he had one that he had ran apparently.
Q The one that you sent to your lab, you are talking about the one that you sent to your lab with the state police?
A Right.
Q And did you get the results back?
A Yes, sir.
The State Police laboratory report was introduced into evidence as Defendants' Exhibit 12 and stated that "[T]he blood was not suitable for analysis due to apparent exposure to extreme heat." Keating gave the following testimony about the chain of custody used by the Louisiana State Police to transmit blood samples to the State Police laboratory:
Q Let me ask you this, Captain Keating. From the time of this accident until this sample was submitted, where would you as the commanding officer of Troop L keep a blood sample in a fatality case such as this until it was submitted to the testing lab?
A Okay. We have a procedure set up by the department when we go to a fatality accident or a serious accident and we take blood. All of the blood is taken by someone else, it is labeled with the evidence label, sealed by the individual taking the blood, put in a container and sealed again, an insulated container and sealed again, put in a box, the paper work made out wrapped around the box, then all of this comes into the troop headquarters. You will notice on there that this was submitted by mail. I have no idea of where the box went when it left the troop except that it went into the mail and it went to headquarters in the mail.
Q But that wasn't my question. My question was what happened to it and where was it kept before it was mailed, from Sunday until Wednesday morning?
A The officer would have submitted it through the normal channels. In other words, he would have made out his reports, he would have taken the blood sample, placed it in the mail, and mailed it to Baton Rouge.
Q Well, would he have mailed it on Wednesday or would it stay in the Troop L headquarters in any particular place until it is mailed?
A I assume that this Wednesday date that you are talking about, the thirteenth, is the date that they got off of the mailing stamp or the cancellation or whatever from the post office.
Q Let me ask you this question, Captain. In a normal investigation like this, in a fatality where you are dealing with a blood sample, what does the police officer do with that blood sample in the kit; does he bring it back to Troop L headquarters for mailing, or does he himself take it to the post office and mail it?
A In most cases he brings it into the troop, puts it in the outgoing mail container, and is picked up by the individual comes into the troop and picks up the mail and takes it with *216 him and it goes into the U.S. mail like all mail.
Trooper Blunschi was qualified as an expert witness in accident reconstruction. His supplemental accident report was filed in evidence by the plaintiffs as Plaintiffs' Exhibit 4 and provided as follows:
On 10-25-83, a review and re-investigation was made of this accident at the request of Captain Keating, Commanding, Troop L. The following changes and additions should be made to the original report.
1. LOCATION: The accident occurred on La. 1040 at its intersection with Stein Road. (this accident is definitely an intersection accident since one vehicle was entering La. 1040 from Stein Road, and was still in the process of turning when hit by the other vehicle.)
2. VIOLATIONS: The report should indicate that Operator #2 "failed to yield". (The truck driver stated he did not see the car on the overpass until after he started to pull out. The overpass is at least 900 feet from the intersection. The investigating officer estimated the speed of the car at 55 MPH, and judging from the physical evidence, this seems reasonable. If the car was traveling in the 55-70 range, then the truck would have had at least 9 seconds and as much as 11 seconds to cross the westbound lane and get straightened out eastbound. The truck did not even get his trailer across the center line, and was still in a turning configuration when struck by the car. I can only conclude the car was much closer when the truck pulled out, probably within the 400-500 feet range, therefore the truck failed to yield.)
The report should now show Operator # 1 checked under "driver condition".
3. REASON FOR MOVEMENT: Operator # 1, "driver condition"; Operator # 2, "due to driver violation".
COMMENT: Operator #1 crossed the center line prior to impact, probably due to (A) an attempt to take evasive action from the vehicle crossing his path, or (B) due to his intoxicated condition, and not aware of the obstruction, or (c) some combination of A and B. (Emphasis added)
On cross-examination, Trooper Blunschi gave the following testimony:
Q Trooper Blunschi, you agree that this driver of the car was intoxicated at the time of this accident, don't you?
A Yes, sir.
Q And why do you agree with that statement; you found that on your report, did you not?
A I think it was indicated in a subsequent report, but also at the time I initiated the investigation, I was informed by Captain Keating, who I think contacted the coroner's office and was advised by the coroner's office that the driver of the car was legally intoxicated at the time of the accident.
. . . . .
BY MR. BREEDLOVE:
Q What do you mean by intoxicated?
A Well, what I am referring to as legally intoxicated is a blood alcohol level of .10 grams percent or higher.
MR. CURET:
May it please the Court, now the witness is giving his legal opinion on a matter of law that is not applicable to this case.
THE COURT:
He can only tell why he put it in his report. I am going to instruct the jury as far as what the law is in this matter.
. . . . .
Q I am asking you, what do you mean by intoxicated when you put it in your report.
A That his blood alcohol level had to be .10 grams percent or above.
Q And that was one of your conclusions as to one of the probable causes of this accident; isn't that correct?
A That is partially. Yes, sir.
. . . . .
Q Let me ask you this then, Trooper. You say you agree that the driver of *217 the car was intoxicated. What is the evasive action when you say probably due to an attempt to take evasive action from the vehicle; what evasive action or evidence of evasive action did you find in your reinvestigation
A Well
Q excuse me, let me finish the questionwhat evidence of evasive action that the car took did you find in your reinvestigation of this accident?
A The car travelled from its lane of travel almost completely across the centerline into the opposing lane of travel for some reason, and I think a logical explanation of that would be as stated here, one, either due to his taking evasive action or, two, possibly due to his being intoxicated, or a combination of the two.
. . . . .
BY MR. BREEDLOVE:
Q How did it get there and what is the information that you had on the blood alcohol level of Kirk McLaughlin?
A I think I stated earlier that I had information that he was, what we refer to as legally intoxicated or higher, and that is the information I used in the report. From memory and I may be confusing this case with another case, but I thought it was .16 grams percent which may or may not be right. I am not sure.
MR. BREEDLOVE:
No further questions, your Honor.
CROSS-EXAMINATION
BY MR. GREMILLION:
Q Trooper, am I correct that it is your opinion that this accident was caused by a combination of the fact that the truck crossing the highway failed to yield right of way to the oncoming automobile and the fact that the driver of the oncoming automobile was apparently intoxicated?
A I think that is a fair assumption, yes, sir.
Robbie Giannobile (Kirk McLaughlin's first cousin), Jack A. Bankston, Sr. (the McLaughlin family insurance agent and friend) and Betty Harper (a family friend) testified that the McLaughlins were a close, loving family.
Mrs. McLaughlin testified that Kirk lived at home with her and Mr. McLaughlin. Kirk worked during the day and when he came home after work he helped with the family chicken farm. Mr. and Mrs. McLaughlin had another son who was married and lived in Florida. On April 10, 1983, Kirk got out of the hospital at about 11:00 a.m. and came home. He left home to go to a crawfish boil, came back home at about 2:00 or 3:00 p.m., changed clothes, and went back to the crawfish boil to ride three-wheelers. Kirk and his father were very close.
Mr. McLaughlin testified that after the accident he went to look at the trailer and he observed that the wires on the trailer were rusted off of the light fixtures. He testified that he and Kirk spent a lot of time together and were very close. Kirk was originally buried at the New Beulah Baptist Church Cemetary, but Mr. McLaughlin arranged to have him reburied on the McLaughlin family property so he could be near him.

The Defendants' Case
State Trooper Bradford E. McGlothren[2] was qualified as an expert in accident investigation. He conducted the initial investigation at the scene of the accident. His accident report was filed in evidence. He found no skid marks or yaw marks in McLaughlin's path of travel from the I-55 overpass to the point of impact.[3] McLaughlin did not have a seatbelt on. When McGlothren leaned in the window of McLaughlin's vehicle to check on him, he smelled an "aroma of an alcoholic beverage in the vehicle." Because of this, McGlothren *218 ordered a blood test taken on McLaughlin and went to the Hospital to observe the blood sample being taken. The blood was drawn at approximately 9:30 p.m. by Dr. John Tomun. McGlothren did not see the coroner, Dr. Ralph Maxwell, that night. Trooper McGlothren collected the blood sample and brought it to Troop L headquarters where he deposited it for mailing to the State Police laboratory in Baton Rouge. He did not issue a traffic citation to the truck driver (Howard Glasper, Jr.) as a result of this accident. There was sufficient room in the westbound lane of the roadway and the shoulder of the roadway for a vehicle to pass around the final resting place of the McNabb trailer.
Howard Glasper, Jr. testified that on April 10, 1983, he and his wife went to church. That night he was scheduled to drive the McNabb truck to deliver an 18,000 pound valve to some place in Texas. He took a nap that afternoon prior to going on the road. After his nap, Glasper went to the McNabb truck yard which is located on Stein Road about one mile north of the intersection where the accident occurred. Before leaving the McNabb truck yard, Glasper performed a routine operational check of the vehicle. He checked the oil, tires and lights and found them in proper order. He noted that the vehicle did not have a full tank of diesel and decided to go to a filling station to tank up.
When Glasper reached the stop sign on the north side of the La. 1040-Stein Road intersection, he stopped. He looked to his left (east), looked to his right (west), and looked back to his left. He observed no traffic on the La. 1040 roadway and commenced making a left turn across the intersection to proceed in an easterly direction on La. 1040. Glasper first saw the McLaughlin vehicle when the cab of the tractor was in the eastbound lane of La. 1040 and about half of the tractor and trailer was in the intersection. Glasper observed the lights of the McLaughlin vehicle coming over the I-55 overpass "on the wrong side of the highway." Glasper testified McLaughlin "was driving pretty fast, but I can't sit up here right now and say how fast he was going." Glasper speeded up to try to get out of the way and pulled the tractor onto the south shoulder of La. 1040. At the time of impact, the tractor was off of the roadway. After the accident, Glasper got out of the tractor, went to a nearby store, and called McNabb.
Earle H. Boudreaux testified he was a retired police officer who was presently employed as a claims manager for two insurance companies. He was qualified as an expert in accident reconstruction. On April 17, 1983, Boudreaux was contacted by Fireman's Fund and asked to investigate the accident. On April 18, 1983, he went to the scene of the accident and met with McNabb and Glasper. He also measured the scene. He then went to the McNabb truck yard and examined the tractor and trailer and went to a salvage yard and examined the McLaughlin vehicle. He examined the lights on the truck and trailer and there was nothing wrong with them. Later, he went back to the scene to verify his measurements of the scene. Boudreaux gave the opinion that "everything he [Glasper] did is in keeping with good defensive driving and with good professional driving tactics. He made every effort to get out of the way." Boudreaux then testified as follows:
Q Now, given the distances that the tractor trailer had to traverse from the stop sign and given the speed that you describe the vehicle approaching the accident, is there an inconsistency in the description of how much time it took to make this maneuver that Howard Glasper testified to and how this vehicle would have impacted the trailer; is there an inconsistency in the calculation of the distances and time for this accident?
A No, sir, I don't think so.
Q In fact, could the accident have happened exactly the way Howard Glasper described it?
A Yes, sir.
Q That is having checked at the stop sign and not seeing a vehicle approach from his left and having pulled out and gotten halfway into the turn and only then seeing the vehicle crest the hill, *219 coming at him, given the fact that there was no braking, no skid marks, and the speed that you calculate there is no consistency [sic] in his version of how the accident would have occurred?
A No inconsistency, no, sir. Everything he tells me and based on the conversations that I had with him, everything is consistent and could easily have happened that way with no problems. I believe it did happen that way.
. . . . .
Q Is there in fact any indication beyond a mere possibility that this accident happened because Howard Glasper pulled out directly in front of a vehicle that was coming at him in the right-hand lane of travel almost immediately before it reached the intersection; is there any indication at all of that?
A No, sir, none.
When Boudreaux was questioned about the manner in which McLaughlin operated his vehicle, he gave the following testimony:
Q Let's do it in the terms of a hypothetical. Given the facts and the description of the accident, as you know it, what would you expect a driver, not necessarily Kirk McLaughlin, but a driver who was driving his vehicle in a safe, prudent, and fully awake manner to do if by chance he found himself very, very close to this collision; what is the first thing you would expect him to do?
A Take immediate evasive action by steering to the right and applying his brakes and attempting to stop his vehicle.
Q Let's talk about the brakes. If he hit his brakes, Mr. Boudreaux, doing at least, if not more than 55 miles an hour, would you expect that he would lay skid marks on the pavement?
A Very good skid marks on that road, easily discernible.
Q And there were none, of course, here?
A No, sir, there were none.
Q Would you expect him to be able to take any evasive action in one direction or the other?
A Yes, sir.
Q Which direction would a safe and prudent driver who is fully aware of the circumstances that he faced, if he were in this position, what direction would he go?
A To the right.
Q And why do you say that, sir?
A Well, he realizes the truck is crossing his path from right to left. If he goes to the left, he is going to do much greater damage in a collision with the forward part of the truck or with other parts of the truck. To the right, he can totally avoid the truck.
Q And in fact based on the measurements that you examined on the police report, your visual inspection of the scene, the measurements that you yourself took was there enough space on the right side of the rear of the trailer for a motor vehicle the size of Kirk McLaughlin's to have passed safely?
A Yes, sir, no problem with that at all.
. . . . .
Q As a professional accident reconstructionist in an attempt to determine the speed of a vehicle, do you consider a personal on-sight inspection in daylight of the crushed vehicle a significant tool with which to determine the speed?
A Well, it helps you provide a range of speeds. I don't think any damage in itself can tell you exactly how fast this car was going, but based on hundreds of accidents that you have investigated and the studies that I have been involved in, you can come up with a range of speeds, a general range that will give you an idea of what the vehicles involved were doing. You can't nail it down to one specific mile per hour.
Q And in fact in this accident, the crush factor that we observe in the photographs is in fact the only direct evidence *220 of speed that you have; isn't that true, Mr. Boudreaux?
A That is correct. We have no other evidence as far as skid marks or yaw marks or anything else.
Q And do you have an opinion as to the range of speed at which this vehicle impacted the trailer?
A Anywhere from 55 to 65 miles per hour, and I would believe in my opinion that it would be at the top end. It would be closer to a 65 mile an hour impact.
Q And again on what evidence do you base that opinion?
A This tremendous crush damage that we see, and the heavy induced damage all the way to the rear of the vehicle.
. . . . .
Q You received a copy of a blood alcohol test that indicated that Kirk McLaughlin was .20 percent blood alcohol; is that correct?
A That is correct, yes, sir.
Q Now, assuming that this driver had a blood alcohol reading of .20 at the time of impact, do you have an opinion as to how and why this accident may have occurred?
A Point two-o is double the legal limit in Louisiana, and at that level you are grossly, your driving ability
MR. CURET:
Excuse me. For the record, I have to note my objection. That is incorrect opinion to give in this court.
THE COURT:
I think it is admissible inasmuch as it has any bearing on his ability to control the automobile. Go ahead, Mr. Breedlove.
BY MR. BREEDLOVE:
A At that level of alcohol everything that it takes to drive a car is grossly affected. Your depth perception is affected. Your ability to judge speed is affected. Your eyesight is affected. Everything that you need to control a vehicle safely and operate a vehicle safely is grossly affected.
Q Mr. Boudreaux, could a driver with a blood alcohol level of .20 at the time of impact conceivably have passed out at the wheel at the crest of this hill if not before, and thus causing his vehicle to go out of control?
A I can't honestly answer that question.
Q Is that a possibility, in your opinion as an accident reconstructionist?
A It is a possibility, yes, sir.
Q And if indeed that would have happened, would you expect that the driver would have had the faculties to apply his brakes and take evasive action?
A No, sir.
Dr. Ralph Maxwell testified he was a medical doctor and had been the coroner of Tangipahoa Parish from 1979 to 1984. He was qualified as an expert in the field of medicine. On April 10, 1983, Dr. Maxwell was called out to the scene of the accident where he examined McLaughlin and pronounced him dead. Dr. Maxwell ordered that McLaughlin's body be placed in an ambulance and transported to the Hospital for a full examination.[4] The time of death *221 was fixed at 8:00 p.m. Dr. Maxwell testified he took two blood samples: one for the State Police and the other for The Pathology Laboratory (TPL). He initially testified he took the State Police sample at the scene of the accident and the TPL sample at the hospital, but subsequently conceded the State Police sample could have been taken at the Hospital.[5]
Dr. Maxwell removed the blood samples directly from McLaughlin's heart with an intracardiac needle. When undamaged, the heart is a good reservoir of uncoagulated blood. The TPL blood sample was placed in a Beckdin, Dickinson Vacutainer forensic blood collection kit vial.[6] This vial had a gray top and contained potassium oxalate to keep the blood from coagulating and sodium fluoride to preserve it. The vial was labeled with the date, McLaughlin's name, Dr. Maxwell's name and the Tangipahoa Parish Coroner's TPL number, which was 1855.[7] Dr. Maxwell placed the TPL sample in the TPL "collection area" at the Hospital. Dr. Maxwell subsequently got a report from TPL containing the result of its analysis. Dr. Maxwell was cross-examined about the fact that Trooper McGlothren's report showed that Dr. John Tumon drew blood from McLaughlin and gave the following testimony:
Q What would you say if I told you that he testified that Dr. John Tumon drew the blood from Kirk McLaughlin?
A I would say that he was incorrect because I drew the blood.
MR. BREEDLOVE:
Your Honor, excuse me. I am going to enter an objection. This is argumentative and whether or not Trooper McGlothern [sic] is here has absolutely nothing to do with this.
MR. CURET:
BY MR. CURET: Your Honor, a
A I draw my own bloods and this is the only way that I could have a pathology specimen with my name on it, and if I may say so

*222 Q Excuse me, Doctor, I am asking the questions. I don't want to be rude to you but
A But you see you are implying that this is an error, and it can not possibly be an error.
MR. CURET:
Your Honor, I would ask
THE COURT:
All right. Let's move on, Mr. Curet. I think it is argumentative any way.
MR. CURET:
Well, he is under cross-examination I can test his credibility on these points.
THE COURT:
He testified that he drew the blood. It may have been that somebody else might have drawn some too but
BY MR. CURET:
A The blood that I sent to the lab and gave to the state police was drawn by me as per this which nobody else could have used. They did not know the numbers that were involved and they did not know who it was on. This matches me. It doesn't match anything else. It is fingerprintable to me, and if anybody else drew anything, good for them, but that doesn't count, and it didn't count in the coroner's office unless I drew it. I don't care what somebody else draws
Q Are you through?
A unless I specifically order them to do that, and then it would be in a hospital record again which you don't seem to have.
Stanley S. Chigoy testified he was a medical technologist. He was an administrative assistant and the supervisor of the toxicology laboratory for TPL. He was qualified as an expert in the fields of medical technology and the analysis of blood samples. Chigoy testified that TPL received the Kirk McLaughlin blood sample drawn by Dr. Maxwell on April 11, 1983 (the day after it was taken). The blood sample was accompanied by a physician's request for analysis form (which is supplied to physicians by TPL). This form was filed in evidence as Defendants' Exhibit 8. This request for analysis form has McLaughlin's and Maxwell's names on it and has Maxwell's identification number of 1855. TPL assigned the unique identification number of 471585 to the sample. Receipt of this sample was entered in the TPL log book on April 11, 1983. This log book entry was filed in evidence as Defendants' Exhibit 9. This log book entry has McLaughlin's name and Maxwell's number (1855). Chigoy gave the following testimony about how the blood sample was transported to TPL:
Q Now, Mr. Chigoy, when a blood sample test is requested by Dr. Maxwell or any other physician, how is that blood sample vial transported to The Pathology Lab, if you know?
A We have a
MR. CURET:
Excuse me. I would like for the witness to confine himself to this particular case, if the Court please.
MR. BREEDLOVE:
Well, this is an expert. He is the administrator of The Pathology Lab, and if you will allow him to answer this question, I will bring it down to Kirk McLaughlin's case.
BY MR. BREEDLOVE:
A Sure. In this particular instance, one of our couriers would have been dispatched during his routine day's work to pick up a specimen either at Dr. Maxwell's office or a location specified by Dr. Maxwell to pick up his specimens. He would have picked up this specimen wherever that is, that I can not say, he would have picked it up and transported it back to our laboratory.
Chigoy testified he tested McLaughlin's blood sample on April 11, 1983, the same day it was received by TPL. The blood sample was mixed with an internal standard and a catalyst (salt), shaken, and incubated at 45°C for 20 to 30 minutes. The alcohol (ethanol) in the sample was liberated from the blood and collected in the "head-space" at the top of the vial. Chigoy removed some of the gas in the "head-space" at the top of the vial with a syringe and injected it into a gas-liquid chromatograph. The chromatograph rendered a *223 tracing on a graph which was compared with a standard to determine the blood alcohol level in milligrams per deciliter. The graph of the chromatograph tracing for McLaughlin's blood sample was filed in evidence as Defendants' Exhibit 10. Chigoy testified that the gas-liquid chromatograph "is the most accurate method available for determining a blood alcohol level." Chigoy determined McLaughlin's blood alcohol level as 0.20 percent. His report to Dr. Maxwell dated April 11, 1983, showed a 0.204 test result and the report was filed in evidence as Defendants' Exhibit 11. Chigoy testified he did not recall if the vial containing the blood had a gray top or not.
Dr. Monroe Samuels, a medical doctor, was qualified as an expert in forensic pathology and toxicology. He testified that with a .20 blood alcohol level, McLaughlin would have been "significantly impaired insofar as his capabilities of operating a motor vehicle." Dr. Samuels stated that McLaughlin's reaction time, coordination, vision, and many other sensory and motor capabilities would have been impaired, including his ability to adjust his vision from far objects to near objects, and his ability to adapt from oncoming bright headlights to immediate resulting darkness. Dr. Samuels gave the following testimony about the procedures used by Dr. Maxwell and Chigoy:
Q Doctor, first of all, with respect to the method by which this blood sample was drawn by Dr. Maxwell, you have reviewed, of course, his deposition; is that correct?
A Yes, sir.
Q Did it provide you a basis upon which to analyze and evaluate, as a forensic toxicologist, whether or not that blood sample extraction would have been proper and in accord with good medical practice at the time?
A One of the things that we have to worry about with regard to any type of analysis is the proper obtaining of the blood sample, and in trauma cases in particular, the sample must be obtained from an intact part of the vascular system. In other words, if the heart is ruptured, forget it. You have to get the blood some place else, but you can't just scoop it out. If it is lying loose in the body cavity, you have to get it from an intact artery or an intact vein. Dr. Maxwell in his deposition stated that he did remove the sample from the heart. Insofar as I have been able to determine from that particular point on until the end of the analysis things appear to have been conducted apparently in the way they should have been.
Q Focusing now on the test that was done, the ethanol level test, perhaps you were present during Mr. Chigoy's testimony today.
A I heard part of it, yes, sir.
Q And in addition to hearing whatever portion of his testimony today, have you had a chance to review the documents that I have identified and submitted to you previously?
A I reviewed the gas chromatography tracing, yes, sir.
Q Are you familiar with that test, Doctor?
A Yes, sir.
Q Do you consider it a state of the art test in this field?
A Yes, sir.
Q Do you feel as if you could come to some conclusion from the test results that were obtained from that test?
A I don't understand what you mean by conclusion.
Q Okay. After reviewing the test results
A I think the result that was rendered was valid. The laboratory in question used standards. They used internal standards and controls, and they observed all of the necessary precautions in order to render a valid answer.
William J. McNabb testified he was the owner of B-Line Services and Hammond Sandblasting, Inc. and Glasper had been working for him since 1971. On April 10, 1983, he was called at home by a Mr. Bickford, who owned a store at the corner (of La. 1040 and Stein Road) and advised that Glasper had been involved in "a real *224 serious accident". McNabb notified his insurance agent who went to the scene of the accident with him. McNabb personally inspected the lights on the tractor and trailer and found "they were all burning".

The Plaintiffs' Rebuttal
Trooper Blunschi was recalled as a witness and testified he did not agree with Boudreaux's opinion about how the accident happened. He agreed with Boudreaux's estimated speed for the McLaughlin vehicle of 55 to 65 miles per hour, but he felt the actual speed was probably in the lower end of the range. He observed that the I-55 overpass was approximately 900 feet from the La. 1040-Stein Road intersection and at a speed of 65 miles per hour a car is traveling 95 feet per second, and, thus, it would take the McLaughlin vehicle about 9 seconds to go from the top of the overpass to the point of impact. He then opined "[I]t would only take the truck at the most six or seven seconds to pull from its position at the stop sign and be completely clear of the eastbound lane." (Transcript p. 430). If it took six or seven seconds for the truck to perform this maneuver, then the McLaughlin vehicle was only 600 or 700 feet from the point of impact when the truck started the maneuver, and, thus, McLaughlin's vehicle was "in plain view on the east side of the overpass". Since Glasper testified he was already in the road before he noticed the car, that would put the McLaughlin car 200 or 300 feet (2 or 3 seconds) away from the point of impact. Just because there were no skid marks does not mean that McLaughlin did not apply his brakes because you can stop a vehicle without leaving any. During cross-examination, Blunschi testified as follows:
Q What is the reaction time for distance traveled?
A Well, it could vary greatly. It could vary greatly depending upon the individual, and in this particular case, there has been some evidence presented that may well indicate that reaction time would have been delayed.
Q Excuse me. You say that in this case the reaction time may have been delayed.
A That is right.
Q Why, why do you say that, sir?
A Because there has been evidence presented that the driver was intoxicated.
Average stopping distance is broken down into three distinct distances: perception distance, reaction distance and braking distance. It can also vary with the coefficient of friction between the roadway and the tires of the vehicle. The average stopping distance for a vehicle going 50 miles per hour with a 0.7 coefficient of friction is 258 feet.
Wallace H. Dees testified he was a deputy with the Tangipahoa Parish Sheriff's Office. He ran a driver's license check on Glasper and it showed Glasper received a speeding ticket on March 17, 1983.

ADMISSIBILITY OF BLOOD ALCOHOL TEST
We agree that the test result of the TPL sample is admissible into evidence pursuant to the test for admissibility set forth in the concurring opinion of Judges Lanier and Vial Lemmon in Wells v. State Farm Mutual Automobile Insurance Company, 573 So.2d 223 (La.App. 1st Cir.1990).
The majority of the 10-judge panel herein cite Allemand v. Zip's Trucking Co., Inc., 552 So.2d 1023 (La.App. 1st Cir.1989), writ denied, 558 So.2d 569 (La.1990) as setting forth the proper foundation for the admissibility (into evidence) of a blood alcohol test result. This foundation requires proof that (1) there is connexity between the specimen and its source, (2) the specimen was properly taken by an authorized person, (3) the specimen was properly labeled and preserved, (4) the specimen was properly transported for analysis, and (5) the specimen was properly tested. We agree that showing the connexity between the specimen (sample) and its source is essential to identification and authentication, and, thus, admissibility. However, we believe that questions concerning proper taking, labeling, preserving, transporting *225 and testing specimens should go to the weight given the evidence, not its admissibility. If the specimen is not properly taken, labeled, preserved, transported or tested, the test result should be given no weight.
In our opinion, by equating proper taking, labeling, preserving, transporting and testing with admissibility, the majority have created an evidentiary nightmare. The majority have failed to define what constitutes proof of proper taking, proper labeling, proper preserving, proper transporting and proper testing. Thus, there are an infinite variety of factual situations that may, or may not, qualify as proper. The practical effect of such an amorphous standard of admissibility is demonstrated by the rationales and results in the Allemand, Wells and instant cases.
In Allemand, the parish coroner took a blood sample from a decedent driver at a funeral home. On that same day (September 23, 1983), a state trooper picked up the sample at the funeral home and brought it to the troop headquarters where it was given to a second trooper. The first trooper could not remember from whom he got the sample at the funeral home. The sample was mailed to the Louisiana State Police Crime Lab in Baton Rouge where it was received by a crime lab employee on October 5, 1983, (a 13 day gap) and given to a forensic scientist, who tested it. The test showed a 0.23 blood alcohol level. The second trooper and the crime lab employee did not testify at the trial. A 3-judge panel of this court (Judges Carter, Savoie and Alford) held that the blood test result was not admissible with the following rationale:
Under these circumstances, we find that a proper foundation was not laid for the admission of the test results. The lapse in Trooper McDowell's memory together with the absence of testimony from Trooper Galliano and Libby Martin left three time periods during which the whereabouts and security of the blood sample were unaccounted for. We find it particularly disturbing that an unexplained lapse of thirteen days occurred between the time Troop C received the blood sample and the time the Crime Lab obtained its possession. Unless proof is made of the proper preservation of the blood sample between the time it is taken and its testing, the subsequent results are unreliable evidence and properly excluded. (Emphasis added)
Allemand, 552 So.2d at 1027. Compare with the holdings in State v. Flood, 301 So.2d 637 (La.1974) (16 day gap) and State v. Coleman, 254 La. 264, 223 So.2d 402 (La.1969) (11 day gap).
In Wells, on March 28, 1986, a registered nurse drew the blood sample from the plaintiff driver at a hospital in the presence of a state trooper. The sample was sealed, initialed and marked with a label showing, among other things, the names of the trooper and the nurse (Jana Dover, R.N.). At some unspecified point in time, the trooper brought the sample to troop headquarters where it was placed in a locked box. The sample was subsequently mailed to the Louisiana State Police Crime Lab in Baton Rouge, where it was received by a criminalist on April 2, 1986. The sample was analyzed by a forensic scientist who found the blood had 0.14 percent blood alcohol. Only the trooper and the forensic scientist testified at the trial. The trial court in Wells found the blood test result admissible and rendered judgment in favor of the defendant. Wells was heard on appeal by a 10-judge panel of this court. Five judges (Judges Watkins, Shortess, Carter, Savoie and Crain), citing Allemand, held that (1) the blood test result was inadmissible and (2) the error was harmless because of other evidence of intoxication in the record, and voted to affirm the trial court judgment in favor of the defendant. Specifically, the 5-judge "lead" opinion observes as follows:
The defendants did not show that the blood was properly taken, properly preserved, and properly transported for analysis. We find it particularly disturbing that the nurse who actually drew the blood did not testify at the trial, to show that the blood was properly taken; furthermore, no one could testify as to the *226 whereabouts or security of the vials between March 28 and March 31 or between March 31 and April 2. "Unless proof is made of the proper preservation of the blood sample between the time it is taken and its testing, the subsequent results are unreliable evidence and properly excluded." Allemand, 552 So.2d at 1027.

Wells, 573 So.2d at 227.
Three judges (Chief Judge Covington and Judges Lanier and Vial Lemmon) concurred and were of the opinion that the testimony of the trooper was sufficient to identify the sample with its source and that the blood test result was admissible and should be given weight. Judge Lottinger concurred and expressed the opinion that the blood test result was admissible. Judge Foil concurred without giving reasons. Because only five judges on a 10-judge panel voted to reverse the trial court on the issue of the admissibility of the blood test result, and the other five judges only concurred in the affirmance of the judgment on the merits in favor of the defendants, the trial court ruling that the blood test was admissible was affirmed. Sovereign Insurance Company v. Texas Pipeline Company, 470 So.2d 969 (La.App. 1st Cir.1985), amended and affirmed, 488 So.2d 982 (La.1986).
In the instant case (McLaughlin), the blood sample was taken by the parish coroner from the decedent driver at a hospital. The blood sample was deposited by the coroner in a collection area at the hospital and the next day a courier brought the sample to TPL for analysis. Only the coroner and the TPL technician who tested the blood testified at the trial; the courier did not testify, nor did any one from the hospital testify. The trial judge found the blood test result admissible. This case was heard on appeal by the same 10-judge panel that heard the Wells case. Six of the ten judges (Judges Watkins, Shortess, Carter, Savoie, Crain and Foil) have decided the admissibility of the evidence with the Allemand test. Four of those six (Judges Watkins, Savoie, Crain and Foil) have found the test result admissible; two (Judges Shortess and Carter) have found it inadmissible.[8] The four judges who found the evidence *227 admissible under the Allemand test used the following rationale, in part, to do so:

The courier in the instant case was not identified and did not testify. However, this is not necessarily fatal to the admissibility of the evidence. It is gaps in possession of the sample as opposed to lack of evidence pertaining to the taking of the sample and its analysis which result in different language by the courts as to foundation evidence necessary to introduce a sample. Gaps in a chain of custody usually affect the weight of the evidence, not its admissibility, and an unbroken chain of custody is not essential for the admissibility of the evidence as long as the foundation evidence as a whole shows it is more probable than not that the evidence tested was that which was originally taken.

This rationale is inconsistent with the rationale in Allemand and the "lead" opinion in Wells. As previously indicated, in Allemand, the 3-judge panel (1) found "it particularly disturbing that an unexplained lapse of thirteen days occurred", (2) found this lapse related to "proper preservation", and (3) ruled the test results "unreliable evidence and properly excluded". In the "lead" Wells opinion, the five judges held that a five day gap related to proper preservation and proper transporting, and, coupled with a failure to call the nurse who took the blood to show proper taking, rendered the test result inadmissible. In the instant case (McLaughlin), the holding is that a one day gap relates to the weight of the evidence and does not render the evidence inadmissible. Query: If a thirteen day gap renders the evidence inadmissible, and similar evidence with a one day gap is admissible, at what point in days (between 1 and 13) is the length of the gap critical?
The instant case is in conflict with, and thus overrules, our prior opinion in Lapoint v. Breaux, 395 So.2d 1377 (La.App. 1st Cir.), writ denied, 399 So.2d 611 (La. 1981). In that case the parents of a deceased guest passenger asserted a wrongful death claim. The defendants argued that the driver of the host vehicle was obviously intoxicated, the decedent guest passenger rode with him anyway, and, thus, recovery should be barred. The defendants introduced into evidence, over objection of plaintiffs, two blood alcohol test results on the deceased passenger. The trial court jury rendered verdicts that the host driver was negligent (intoxicated) and the decedent guest passenger assumed the risk. Judgment was rendered in favor of the defendants. On appeal this court reversed the trial court ruling on the admissibility of the blood tests and rendered judgment in favor of the decedent guest passenger's parents. The evidence showed both blood samples were taken by the parish coroner during an autopsy. One was mailed to the State Crime Lab and the other was hand delivered to a diagnostic laboratory. This court found the results of the test made at the State Crime Lab were inadmissible because there was no evidence as to who mailed the sample or how it was received, and the person who tested the sample was deceased and unable to testify. The result of the test made by the diagnostic laboratory was ruled inadmissible with the following rationale:

*228 The evidence shows that the other sample was picked up by a man from the Medical Pathology Laboratories, Inc., and by him delivered to that laboratory, where it was immediately tested. The man who picked up and delivered the blood sample did not testify nor did the person who delivered the sample to him. The person who actually performed the test testified as to how samples were customarily picked up and delivered, as to how the test was conducted, and the results thereof. There is therefore, nothing but the label on the sample to connect the testimony of the coroner and that of the person conducting the test. We find that this chain of circumstances does not satisfy the requirements of the law, and the evidence as to the result of the second test should have been excluded.

Lapoint v. Breaux, 395 So.2d at 1380-1381. (Emphasis added)

INTERPRETATION OF THE LOUISIANA SUPREME COURT'S REMAND ORDER
As indicated in the "lead" opinion, the Louisiana Supreme Court has remanded this case to us with instructions "to determine whether defendants laid a proper foundation for admission of the blood-alcohol test results and to reconsider the apportionment of fault between the parties." The judges of this court have given these instructions three different interpretations. In her concurring and dissenting opinion filed herein, Judge Vial Lemmon has expressed the opinion that "[S]ince the majority affirms the admissibility of the test, a review of the Court of Appeal's affirmance of the jury's finding of fault is inappropriate..." Judge Lottinger agrees with "the reasons assigned by Vial Lemmon, J., except that I believe a review of the jury's finding of fault is appropriate" and he would affirm the jury verdict. Conversely, the "lead" opinion interprets the Supreme Court order as follows:
We have been ordered by the Louisiana Supreme Court to "reconsider the apportionment of fault between the parties." This directive was not made contingent on how we ruled on "whether defendants laid a proper foundation for admission of the blood-alcohol test results." Since the trial court jury apportioned the fault herein as 0% to Glasper, and, thus 100% to McLaughlin, a reconsideration means we must consider an apportionment of different percentages and that the jury's apportionment was clearly wrong. This further means that some fault must be attributed to Glasper.
We do not agree with either of these interpretations. We believe a reasonable interpretation of the order is that we must determine the admissibility of the test result, and thereafter reconsider the apportionment of fault between the parties and, after having done so, we would reassess the fault if (1) the blood alcohol test result is found to be inadmissible and the jury verdict interdicted, or (2) we find the jury verdict of no fault by Glasper to be clearly wrong (manifestly erroneous); otherwise, if we find that the blood alcohol test result is admissible and find no manifest error in the jury verdict, we can affirm.

RECONSIDERATION OF THE FAULT OF THE PARTIES

McLaughlin's Fault
We agree with the "lead" opinion that the evidence shows that McLaughlin was driving while intoxicated and failed to take proper action to avoid the accident. The evidence also shows that McLaughlin was speeding.
Trooper Blunschi and Boudreaux both testified that they relied on the collision damages to the vehicles to determine McLaughlin's speed at the point of impact. Both experts conceded that inspection of collision damages was not a very precise way to determine speed; this method was used in the absence of any better evidence. (Glasper testified McLaughlin was going "pretty fast" but he could not "say how fast he was going.") Trooper Blunschi estimated the point of impact speed at a range of 55 to 65 miles per hour and said it was probably in the lower end of the range. Boudreaux opined the point *229 of impact speed at a range of 55 to 65 miles per hour and said it was probably in the higher end of the range. Trooper McGlothren's accident report shows the posted speed limit on La. 1040 as 55 miles per hour. Because the speed estimates were given for the point of impact (based on the collision damages at the point of impact), the question is raised as to what was the speed prior to the point of impact. If McLaughlin took his foot off of the accelerator and/or applied his brakes prior to impact, his speed was even higher than that at the point of impact. The jury could have accepted the testimony of Boudreaux and concluded McLaughlin was speeding. Such a factual determination is not clearly wrong. Operating a vehicle at a speed over 55 miles per hour on La. 1040 constitutes the offense of speeding in violation of La.R.S. 32:61 et seq.

Glasper's Fault
We agree with the "lead" opinion holding that the plaintiffs failed to prove that Glasper was operating the truck without adequate lights. We do not agree with the majority holding that "[T]he jury's failure to find that Glasper did not yield the right of way was clearly wrong."
The evidence about whether Glasper failed to yield the right of way was presented in the testimonies of Glasper, the plaintiffs' expert (Trooper Blunschi) and the defendants' expert (Boudreaux). The "lead" opinion reviews Glasper's testimony and the testimony of the plaintiffs' expert. The "lead" opinion does not review or discuss the testimony of the defendants' expert. However, the jury obviously accepted the testimonies of Glasper and the defendants' expert. This credibility determination by the jury can be clearly wrong (manifestly erroneous) only if the stated reasons of the defendants' expert (Boudreaux) are patently unsound. Lirette v. State Farm Insurance Company, 563 So.2d 850 (La.1990). Pursuant to the Lirette case, a review of the expert testimony which was accepted by the fact finder is essential on appellate review. The "lead" opinion does not discuss why or how the opinion of the defendants' expert is patently unsound. Thus, the "lead" opinion is in direct violation of the directive of Lirette. A review of all pertinent testimony shows the error in the "lead" opinion's analysis of this evidence.
Glasper testified he stopped at the stop sign on the north side of the La. 1040-Stein Road intersection. This stop sign is located 36 feet north of the north edge of the La. 1040 roadway.[9] The length of the truck (tractor and trailer) is 46 feet (per the Boudreaux scale drawing). Glasper testified that after he ascertained the roadway was clear, he commenced to make a left turn across the intersection, and, when the tractor of the truck was in the eastbound lane of La. 1040, he observed the McLaughlin vehicle coming over the I-55 overpass, which was approximately 900 feet away. At this point in time, the front of the truck had traveled approximately 58 feet (36 feet from the stop sign to the roadway, 12 feet across the westbound lane, and 10 feet from the front to the rear of the tractor). Glasper accelerated and pulled left (eastward) across the intersection and onto the south shoulder of La. 1040. Glasper described this maneuver as follows:
Q Now, once you caught a glimpse of the headlights, what went through your mind?
A Well, I was shifting, I had shift from first to second, I was going into third gear. All right. Just as I was going up the overpass, the lights of the vehicle was, see this is the street here, was on my side of the street, but I had no intentions of letting anyone run into the head of the truck for the simple reason I am in the head of the truck and the truck is made out of mostly *230 fiberglass and I have seen these trucks where they have been hit before. So actually I shifted on into high gear and he went back over to his lane which was the westbound lane. So I was trying to get the rest of my speed up, and when I got the rest of my speed up, I was somewhere along in here. He went back to his lane.
Q That is all right.
A He went back into his lane somewhere along in here, then he came back at me again, he came back at the truck that I was riding in.
. . . . .
Q Yes, Howard, these folks have to see. I know it is difficult for you, but can everybody see now okay.
A All right. So he went back into his lane and he made another swerve which I don't know if it was a swerve or whatever, and he came back at the truck again. So I had no alternative just like I said for him to hit the cab of the truck.
Q What did you do then?
A I run the tractor of the truck, the tractor part which is the cab off the shoulder of the road, and by that time he had came back across the yellow line and when he hit the back of the trailer that is when he and I both stopped.
Q So if I understand you correctly, Howard, when you got up into this area and he was back on a head-on course, you turned the tractor towards the shoulder?
A Yes.
Q Why did you turn towards the shoulder?
A Well, if he was going to hit anything, I would much rather for him to hit the trailer instead of the tractor.
Q For a head-on collision?
A That is right.
Q Did you think it was possible that you could have perhaps gotten the trailer as well as the tractor completely out of the way by getting over as far to the right as you could?
A Well, I was trying to get over, but to my recollection, I didn't know what he was going to do. Just like I said, I got as much of the truck out of his way as I possibly could. The tractor part was out of his way, but the trailer part was not because he came over and when he came over, he ran down the trailer when he hit.
Boudreaux described what happened during this maneuver as follows:
Q I am talking about Mr. Glasper.
A Yes, sir. Once he was in the position where he realized that a vehicle was approaching him and there was a possibility of a head-on collision, he made every effort to try and reach the shoulder of the road as much as possible; and I think at the same time being aware of the fact that there was a chance of a head-on collision in trying to get off the road. All of this time you have to recall that he is shifting through a total number of gears, fourteen or fifteen gears. I think he had said in his testimony he was into third gear, then he had to reshift when he realized what was happening. It is a complicated task that he was trying to perform and still get the truck over to the shoulder of the road. It is a very difficult task, but everything he did is in keeping with good defensive driving and with good professional driving tactics. He made every effort to get out of the way. Unfortunately one of the things that happens in a situation like this where he is attempting to steer away from the point of impact is that as he moves to the right or steers to the right to reach the shoulder of the road, he changes the direction of the cab of the truck. He then loses some of the forward momentum of the trailer so that the trailer doesn't move out of the way as quickly as it could if he had just kept on a straight line and just went up the road, you know, with the chance of a head-on collision.
Q Mr. Boudreaux, with the Court's permission, I would like for you to come down here and on this diagram demonstrate that maneuver and the way the *231 trailer would swing when the truck driver makes such a movement.
A Okay. The trailer is not going to swing that much. What happens is that the action of the trailer is altered. As he pulls out in this fashion, he reaches a point in here where he says he saw the other vehicle approaching and he decides to go to the shoulder of the road. If he continues straight, the trailer tracks with him and goes right around the lane. Once he alters the path of the tractor to try and reach the shoulder, the tractor then begins to move this way more quickly than it moves forward. You have to realize how the two vehicles are hooked up. There is a connection between the two, a single pivot point, so when he turns his tractor this way instead of the trailer tracking straight ahead as it would if he had pulled straight ahead on the road, the lead part of the tractor then begins to track behind the trailer which leaves the rear-end out a little longer than it would be if he made the straight pull out like this, and that is what he is faced with when he decides to alter his course and trying to get on the shoulder of the road to avoid a head-on collision.
Q And in making that maneuver and facing the situation that you suggest and he described, that is, the possibility of a head-on collision, is there any other safer maneuver that he could have made in an effort to avoid this collision?
A No, sir. You have to remember that the truck driver is aware of the fact that he is carrying a tremendous load and slightly possibly in the case of these valves a little top heavy. He is aware of all of these things. He is aware ofthis man is a professional driver. He is hauling heavy, heavy equipment around, and he knows that any really sudden move might turn the whole rig over so he has to be extremely careful. He has to be a terrific driver. He is faced with a lot of problems. Driving one of these rigs is unbelievable. Some of them are fifty-five, sixty feet in length, and he is fully aware that when he pulls onto a road he has all of that behind him and he has to clear that.
Q Mr. Boudreaux, assuming all of the difficulties and the large load and the difficulties in pulling his rig out from this type of a stop sign at this type of an intersection, you heard Mr. Glasper testify as to what he observed and what he did when he pulled up to this stop sign. Having visited the scene, having observed the distances and what have you, do you have an opinion as to whether or not in fact he could have pulled this rig out in a safe manner onto 1040?
A Based on his testimony and where he says he saw the other vehicle approaching at the time he saw it, he had adequate time to do what he had to do.
Q And in fact is there any alternative in your view as an accident reconstructionist that he would have had given the circumstances that he faced once he began to make this maneuver pulling out into the highway?
A Not much else. If he tries to make too hard of a right turn, he might overturn the rig, he might run into the building on the corner, the service station, the gasoline pumps, so I think he took the best course possible which was to try to get off of the road as much as possible. He had to keep pulling forward to clear the entire road with his trailer.
At the point where the truck came to rest on the south shoulder, the front of the truck was located 67 feet east of the Stein Road edge of the intersection.[10] The truck crossed the intersection diagonally rather than at a right angle. Thus, it would appear that the front of the truck traveled approximately 135 feet from the stop sign to its final resting position (36 feet from *232 the stop sign to the north edge of the La. 1040 roadway, 32 feet diagonally across the intersection, and 67 feet to final resting position).
If it is assumed that the McLaughlin vehicle was traveling 65 miles per hour (as Boudreaux stated and apparently what the jury believed), it would have taken 9.5 seconds for it to travel the 900 feet from the I-55 overpass to the point of impact (65 miles per hour is 95 feet per second and 900 feet divided by 95 feet per second is 9.5 seconds). This assumes that McLaughlin did not take his foot from the accelerator and/or attempt to brake the vehicle. Further, pursuant to Boudreaux's theory of the accident, during this 9.5 seconds the front of the truck traveled approximately 77 feet from the point where Glasper saw the car (58 feet from the stop sign) to the truck's final position on the shoulder (135 feet from the stop sign). This means that the average speed of the front of the truck during this maneuver, per Boudreaux's theory of the accident, was 8.1 feet per second (77 feet divided by 9.5 seconds), or 5.5 miles per hour (8.1 feet per second times 3600 seconds per hour, divided by 5280 feet per mile). Boudreaux specifically testified there was no "inconsistency in the calculation of the distances and time for this accident".
Trooper Blunschi assumed it took the truck 6 or 7 seconds to leave the stop sign and clear the eastbound lane. He did not explain why he made this assumption. This means that pursuant to Trooper Blunschi's theory of the accident, the rear of the truck (trailer) had to travel 94 feet (46 feet from the front of the truck to the rear of the truck, plus 36 feet from the stop sign to the edge of the road, plus 12 feet for the width of the eastbound lane) in 7 seconds, which translates into an average speed of 13.4 feet per second, or 9 miles per hour for the rear of the truck. Thus, Blunschi opined it was impossible for the accident to happen as Glasper testified because if Glasper could clear the westbound lane 7 seconds after leaving the stop sign, and Glasper had 9.5 seconds to clear the eastbound lane with the truck after first observing the McLaughlin vehicle, there would have been no contact between the vehicles. From this, Trooper Blunschi opined that Glasper must have pulled out right in front of McLaughlin when McLaughlin was in Glasper's range of vision and McLaughlin was unable to avoid the accident.
The speed of the truck during this turning maneuver appears to be crucial to evaluating the evidence in this case. However, most of the evidence on this issue is opinion evidence which is supported by few, if any, physical facts. A review of Glasper's trial testimony shows that he was not specifically questioned by either side about his speed. Trooper McGlothren listed the truck's estimated speed in his accident report as 15 miles per hour, but he was not questioned about how he arrived at that figure.[11] Trooper Blunschi was not asked to explain why he concluded that the truck should have cleared the westbound lane in six or seven seconds (an average speed of 9 miles her hour to cover 94 feet in seven seconds). In Boudreaux's opinion, Glasper properly operated the truck by traveling 77 feet in 9.5 seconds at 5.5 miles per hour. Obviously, if the average speed of the truck was slower it would take longer to clear the westbound lane. Under these circumstances, it is impossible to say that Boudreaux's expert opinion was patently unsound.
Accordingly, we conclude that the jury verdict finding no fault on the part of Glasper was not clearly wrong (manifestly erroneous), and the trial court judgment should be affirmed.
*233 
*234 MARY ANN VIAL LEMMON, Judge Pro Tem., concurring in part and dissenting in part.
I concur with the holding of the majority that the blood alcohol test is admissible.
The Supreme Court summarily reversed the judgment of the Court of Appeal which held the plaintiffs failed to properly preserve their chain of custody objection for appellate review and ordered this court to rule on the admissibility of decedent's blood alcohol test and to reconsider the fault of the parties in light of that ruling. Since the majority affirms the admissibility of the test, a review of the Court of Appeal's affirmance of the jury's finding of fault is inappropriate. I respectfully dissent from the majority's review and reversal thereof.
FOIL, Judge, concurring in part and dissenting in part.
I concur with the opinion of Judge Crain, except for his apportionment of fault between the parties. I would assign 75% fault to McLaughlin and 25% to Glasper.

ON REHEARING
CRAIN, Judge.
We grant this rehearing for the sole purpose of having the majority of those who are participating in the case agree on an apportionment of fault. The apportionment of fault agreed upon is 37 percent of McLaughlin and 63 percent to Glasper and the following decree is rendered:

DECREE
For the foregoing reasons, the judgment of the trial court is reversed, and judgment is rendered in favor of Mr. and Mrs. McLaughlin and against Glasper, McNabb and Fireman's Fund, in solido, in the amount of $150,000 for each plaintiff, each to be reduced by 37 percent to $94,500, together with legal interest thereon from date of judicial demand until paid. All costs are assessed in accordance with the parties' percentages of fault.
This decree is concurred in by six judges of the ten who participated in the case. La. Const. Art. 5, § 8(B) provides that, "A majority of the judges sitting in a case must concur to render a judgment". Under the 1921 Constitution, Art. 7, § 23 required courts of appeal to sit only in panels of three or en banc. Thus, when sitting in a panel of more than three, the Court of Appeal had to be sitting en banc, regardless of the number who actually participated. Accordingly, Dauzat v. Allstate Insurance Company, 257 La. 349, 242 So.2d 539 (1970) held that when sitting en banc, the vote of a majority of the judges on the court rather than a majority of those sitting was necessary to render a decision. However, under the 1974 Constitution, Courts of Appeal can sit on panels of "at least" three judges, or in some instances, "at least" five judges. La. Const. Art. 5, § 8(A) and (B) (1974). Implementing this provision is Court of Appeals, Uniform Rule 1-5, which provides that when the Court deems it necessary it may sit "in panels of more than three judges or en banc" (emphasis supplied). When the Court is required by law to sit "en banc" (with the full complement of its members) Dauzat would still require that a decree be rendered by a majority of the full complement, regardless of the number actually sitting. However, when not required to sit en banc, Art. 5, § 8(A) and (B) of the 1974 Constitution requires that the decree be rendered by the majority of those sitting.
In this case the Court was not required by law or rule to sit en banc. Consequently, when two less than the full complement of the Court participated in the case, the Court sat as a panel of ten rather than en banc. In accordance with the 1974 Constitution, six of those sitting is necessary to render a judgment.
On rehearing, the judgment of the trial court is reversed and judgment is rendered in accordance with the decree set forth in this opinion.
REVERSED AND RENDERED.
SHORTESS and CARTER, JJ., concur with statements.
*235 LANIER, J., concurs with granting a rehearing but otherwise dissents and assigns reasons.
LOTTINGER, J., dissents.
VIAL LEMMON, J., dissents from the review and reversal of the Court of Appeal's affirmance of the jury's finding of fault.
COVINGTON, C.J., dissents.
SHORTESS and CARTER, JJ., concurring.
SHORTESS, Judge.
We agree with the majority opinion on rehearing because it is essential that a decision be finally rendered in this case.
We continue to adhere to the views expressed in Judge Carter's dissenting opinion in McLaughlin v. Fireman's Fund, 549 So.2d 327, 347 (La.App. 1st Cir.1989), and in the concurring and dissenting opinion of Judge Shortess, see pages 212-214.
We respectfully concur.
LANIER, Judge, concurring in part and dissenting in part.
I agree that a rehearing should be granted herein. I dissent from granting the rehearing peremptorily and solely for the purpose of having 6 judges of this en banc (12) sitting of the court reach an agreement on the apportionment of fault. A majority of an en banc (12) sitting of this court is 7 judges, not 6. A full rehearing should have been granted, and the case should be reheard before 12 judges. A 6-judge decision at an en banc sitting of this court is not a majority of the court within the purview of La. Const. of 1974, art. V, § 8(B). Sovereign Insurance Company v. Texas Pipeline Company, 470 So.2d 969 (La.App. 1st Cir.1985), amended and affirmed, 488 So.2d 982 (La.1986). The judgment rendered herein is null and void.

THE DECISION ON ORIGINAL HEARING
Pursuant to the order of the Chief Judge of this court, an en banc sitting of this court was convened to hear this case. An en banc sitting of this court is composed of 12 judges. La.R.S. 13:312.1(A). Oral arguments in this case were heard on November 9, 1990. At that time, only 10 judges of this en banc (12) sitting of the court were present. This discrepancy was explained on the first page of the original decision of the court, handed down on February 25, 1991, as follows:
*Judge Mary Ann Vial Lemmon of the 29th Judicial District Court is serving as Judge pro tempore by special appointment of the Louisiana Supreme Court to fill the vacancy created by the illness and subsequent death of Judge Steve A. Alford, Jr.
** Judge Wallace A. Edwards has recused himself from hearing this case.
Judge Daniel W. LeBlanc did not participate.
Similar language was placed on the first page of the opinion on rehearing.
The opinions of the 10 judges who were present to hear this case were divided. Six (6) judges (Watkins, Shortess, Carter, Savoie, Crain and Foil) voted to reverse the jury verdict in favor of the defendants. Four (4) judges (Covington, Lottinger, Lanier and Vial Lemmon) voted to affirm the jury verdict. The 6 judges who voted to reverse were seriously divided on the issue of apportionment of fault. Three (3) judges (Watkins, Savoie and Crain) voted to allocate the fault at 50% to the decedent, Kirk McLaughlin, and 50% to the defendant, Glasper. Two (2) judges (Shortess and Carter) voted to allocate the fault at 0% to McLaughlin and 100% to Glasper. One (1) judge (Foil) voted to allocate the fault at 75% to McLaughlin and 25% to Glasper. The original opinion was handed down in this posture. Compare Derbofen v. T.L. James & Co., Inc., 355 So.2d 963 (La.App. 4th Cir.1977), writs denied, 357 So.2d 1156, 1168 (La.1978).

THE DECISION ON REHEARING
The 6 judges who voted to reverse the jury verdict herein have peremptorily granted a rehearing and reformed the original decree to allocate the fault at 37% to McLaughlin and 63% to Glasper. The opinion *236 on rehearing also holds that this court can validly render a judgment with 6 votes, rather than 7, under the procedural facts of this case. The essence of the rationale of this holding is set forth at page 2 of the rehearing as follows:
In this case the Court was not required by law or rule to sit en banc. Consequently, when two less than the full complement of the Court participated in the case, the Court sat as a panel of ten rather than en banc. In accordance with the 1974 Constitution, six of those sitting is necessary to render a judgment.
Pursuant to the order of the Chief Judge of this court, the Clerk of this court scheduled an en banc sitting to hear this case on November 9, 1990. See Appendix "A" attached hereto. The official docket prepared by the Clerk for this sitting shows that it was en banc. See Appendix "B" attached hereto. The official minutes of this court for the hearing on November 9, 1990, show that the court convened en banc. See Appendix "C" attached hereto. In the original and rehearing opinions, Judge Crain explained why there were only 10 judges present at this sitting of the court. Query: If this was a 10-judge panel, rather than an en banc sitting, why make such an explanation? I agree that this court was not required by law or rule to sit en banc (12) herein. I also agree that if this court was ordered to sit in a 10-judge panel, that 6 judges would constitute a majority. However, as a matter of fact, we were ordered to, and did, sit en banc in the instant case. I do not agree that the absence of an individual judge (whether for valid cause or not) can amend or modify the order for an en banc sitting issued herein. That order remains in effect until it is changed by the Chief Judge or by rules of the court. La.Const. of 1974, art. V, § 12. Cf. La.Const. of 1974, art. V, § 8(A); Uniform Rules, Courts of Appeal, Rule 1-5. The practical implications of allowing an individual judge to change or affect such an order of the Chief Judge merely by his absence are significant. Accordingly, I do not agree that the absence of 2 judges from this en banc (12) sitting of the court converted this en banc sitting into a 10-judge sitting.
The instant case is very similar to Dauzat v. Allstate Insurance Company, 257 La. 349, 242 So.2d 539 (1970). Dauzat was decided under La.Const. of 1921, art. VII, § 26 which, at that time, provided as follows:

No judgment shall be rendered by any of the courts of appeal unless a majority of the judges sitting in the case have read the record and have concurred in the judgment. If for any reason they cannot concur, or if one or more of the judges are absent, recused, or unable to serve, they, or the remaining judges, may appoint district judges, or lawyers having the qualifications of judges of courts of appeal, to sit in the case. (Emphasis added)
Dauzat was a worker's compensation case in which the trial court rendered judgment in favor of the plaintiffs for death benefits and statutory penalties. The defendants appealed to the Court of Appeal, Third Circuit, assigning error in the statutory penalty award. The operative procedural facts are set forth in Dauzat, 242 So.2d at 540 as follows:
Oral argument was presented to a panel of three judges on original appellate hearing. Thereafter, counsel was notified by letter that the case was resubmitted en banc on such briefs as had been previously filed and on any additional briefs counsel might desire to file. The case was resubmitted on additional briefs on December 29, 1969. No oral argument was made at that time, and counsel at no time requested oral argument for the resubmission. The complement of the Court of Appeal, Third Circuit, is six judges; but, only five judges considered this matter, the sixth or absent judge being one who had sat on the original panel. The Court of Appeal amended the judgment of the trial court insofar as it assessed penalties and attorney fees against the employer; it affirmed it in all other respects. Two judges dissented. After application for rehearingoral argument was prayed forwas denied, (two judges dissented from the refusal to *237 grant a rehearing) Certiorari was applied for to this Court.
The Louisiana Supreme Court concluded that 3 judges were not a majority of an en banc sitting of the 6-judge Third Circuit at which 5 judges were present with the following rationale:
We find that the above reasoning in the Jackson case and the definitions quoted can be applied herein in determining the number of judges necessary to constitute an en banc sitting of a Court of Appeal. The court cannot sit in panels, divisions, or sections when sitting en banc. We find that it is not necessary that the entire complement of the court here, six judgesbe present or sitting on the bench in order to constitute a sitting en banc. All that is required is a majority of the complement of the court; four judges would constitute a majority of the Court of Appeal, Third Circuit. Of course, the entire court may sit, and it is possible that an extra judge or lawyer called in by the court to break a deadlock may also sit with the entire court. Herein, the Court of Appeal, Third Circuit, sitting en banc with five members present was competent to render judgments in the present controversies. Such judgments, however, had to be rendered by majority vote.
The last question we must answer is whether a majority vote has to be by a majority of the judges of a Court of Appeal sitting en banc or by a majority of the membership or complement of the Court of Appeal. A reading of the Jackson case supra, and all sections of the Louisiana Constitution and Louisiana statutory law pertaining to the present issues constrains us to conclude that when the Court of Appeal sits en banc, a judgment must be rendered by a majority of the full complement or membership of the Courtnot a majority of those sitting en banc. The Court of Appeal, Third Circuit consists of six judges; therefore, a majority decision and judgment has to be concurred in by four members of that Court or its complement when it is sitting en banc. Art. VII, Sec. 26, La. Const. of 1921, supra, provides a legal tool whereby a concurrence can be secured and a majority decision and judgment rendered. No district judge or lawyer was called to sit in the instant controversies; judgments were rendered by three members of a five judge court sitting en banc, with two dissents in each case. A majority judgment had to be rendered by four members of the en banc court; this did not take place. The judgments are therefore not valid and must be set aside.
(Underscoring italicized in original) (242 So.2d at 546)
La. Const. of 1974, art. V, § 8(B) provides as follows:
(B) Judgments. A majority of the judges sitting in a case must concur to render judgment. However, in civil matters only, when a judgment of a district court is to be modified or reversed and one judge dissents, the case shall be reargued before a panel of at least five judges prior to rendition of judgment, and a majority must concur to render judgment.
(Emphasis added)
There is no significant difference between the operative language of La. Const. of 1921, art. VII, § 26 and that of La. Const. of 1974, art. V, § 8(B). Article V, § 8(B) was presented to the Louisiana Constitutional Convention of 1973 by the chairman of the Judiciary Committee of the Convention, and he observed that "[O]f course the rule that a majority must concur is retained also." Vol. 6 Records of the Louisiana Constitutional Convention of 1973: Convention Transcripts, p. 749, proceedings of August 16, 1973. Where a constitutional provision similar to that contained in a prior constitution is adopted, it is presumed such provision was adopted with the construction previously placed on it by the jurisprudence. Dickie's Sportsman's Centers, Inc. v. Department of Transportation and Development, 477 So.2d 744 (La.App. 1st Cir.), writ denied, 478 So.2d 530 (La. 1985); State In The Interest Of Cox, 461 So.2d 658 (La.App. 1st Cir.1984), writ denied, 464 So.2d 1375 (La.1985).
*238 The rationale of Dauzat is applicable in the instant case. Six (6) judges is not a majority of a 12-judge en banc sitting of this court. The decree rendered herein is not valid because the votes of 7 judges were required.
I respectfully concur in part and dissent in part.

*239 APPENDIX A

*240 APPENDIX B

*241 
NOTES
[*] Judge Wallace A. Edwards has recused himself from hearing this case.

Judge Daniel W. LeBlanc did not participate.
[**] Judge Mary Ann Vial Lemmon of the 29th Judicial District Court is serving as Judge pro tempore by special appointment of the Louisiana Supreme Court to fill the vacancy created by the illness and subsequent death of Judge Steve A. Alford, Jr.
[1] See copy of the Boudreaux diagram of accident scene filed in evidence as Defendants' Exhibit 4 which is attached hereto as Appendix A. Defendants' Exhibit 2C is a photograph that shows the relationship of the vehicles to the centerline. A portion of the right rear of the McLaughlin vehicle was in the westbound lane.
[2] In the transcript, the trooper's last name is spelled "McGlothern".
[3] A "yaw mark" is an arc-shaped deposit of tire rubber left on the highway by a vehicle which is traveling in a forward direction but is simultaneously swerving or sliding sideways.
[4] In his accident report, Trooper McGlothren stated that McLaughlin "was transported to 7th Ward Hospital where he was pronounced dead on arrival by Dr. Elhael." Dr. Elhael was not called to testify at the trial. Dr. Maxwell explained this as follows:

BY MR. CURET:
Q We are going to go back to my question, Dr. Maxwell. What would you say if I told you that Officer McGlothern, who testified, that the body of Kirk McLaughlin was pronounced dead at the hospital by, I can't find the doctor's name now but it is a strange spelling, E-L-H-A-E-L.
MR. BREEDLOVE:
Objection, your Honor, it is argumentative.
THE COURT:
He is under cross-examination. He can answer it if he can.
BY MR. CURET: [sic]
A If I can remember but the thing is I feel that if it was, then it would be on an emergency record to verify that it was pronounced because they always make emergency records. When a body enters the hospital emergency room, and a man is pronounced by a physician at the hospital, it is written on a record, it is pronounced, the time is written. If you have such a record, then I would agree with you that my memory may be faulty. If you do not have such a record, then I would say that my memory is maybe more accurate.
Q More accurate than what, Doctor?
A Than a hearsay of another physician who maybe was there and they also, when they come through the emergency room, understand the ambulance transports them not directly to the morgue, but through the emergency room, after we ship them, and then they are directed from the emergency room to the morgue, and he may have seen somebody on traversing. They may do that. They do do that sometimes.
Q Officer McGlothern is in the room this afternoon.
A Good.
[5] On cross-examination, Dr. Maxwell gave the following testimony about whether the State Police sample was taken at the scene of the accident:

Q You attended this scene?
A Yes.
Q You are positive of that?
A Yes.
Q And you are positive that you drew blood there?
A Well, I can't say whether I drew it there or at the hospital, but in the usual course of events, I would have to say the majority of time and the majority of instances the blood is taken at the scene.
Q I understand that. You have made it quite clear what you do the majority of the time. I don't mean to be difficult, but I want you to think clearly
A Can I
Q Yes, I want you to be very careful to refer to this case when you answer please, sir.
A I can't give you a specific answer whether it was drawn at the scene or at the hospital, but the difference would have been twenty minutes and it wouldn't have made a difference except that the blood alcohol level if it was taken at the hospital may have been a little bit lower than it would have been at the scene.
Q What would you say if I told you that Trooper McGlothern has testified that you, I believe he said you were not at the scene of the accident, but that you called him and told him to ship the body to the Seventh Ward morgue.
A Well, I would say that I would have thought that I would have been at the scene.
Q Would you say then that your memory must be faulty in this regard?
A I can't say that. I would say that going back three years, I usually attend all scenes, and I don't remember not attending this scene.
Q Do you remember attending it?
A I believe I do, but I can't recall specific instances.
[6] On cross-examination, Dr. Maxwell conceded that the State Police sample could have been put in a kit provided by the State Police.
[7] Dr. Maxwell had a separate identification number for his private practice.
[8] Further, even if the blood alcohol test result was improperly admitted into evidence, it would appear that such an error is harmless under the particular facts of this case. The plaintiffs introduced the report of Trooper Blunschi into evidence during the presentation of their case. In his report Trooper Blunschi stated that McLaughlin "crossed the center line prior to impact, probably due to (A) an attempt to take evasive action from the vehicle crossing his path, or (B) due to his intoxicated condition, and not aware of the obstruction, or (C) some combination of A and B." (Emphasis added). Thus, the plaintiffs themselves presented evidence of McLaughlin's intoxication to the jury. On cross-examination, Trooper Blunschi testified that McLaughlin was legally intoxicated and he thought his blood alcohol level was 0.16 grams percent. Although counsel for the plaintiffs raised several objections during the course of the cross-examination, none of those objections have been made the subject of an assignment of error in this appeal. Finally, in rebuttal, Trooper Blunschi testified that McLaughlin's reaction time may have been delayed because he was intoxicated. The defendants' reconstruction expert, Earle H. Boudreaux, testified in front of the jury before Dr. Maxwell and Chigoy did. He stated he received a copy of a blood alcohol test that indicated McLaughlin had a 0.20 blood alcohol level and at that level "[E]verything that you need to control a vehicle safely and operate a vehicle safely is grossly affected." Error in the admission of this evidence has not been asserted in an assignment of error in this appeal.

Thus, by the time Dr. Maxwell and Chigoy testified, their evidence concerning McLaughlin's blood alcohol level was cumulative only. A party asserting error bears the burden of showing an assigned error was prejudicial to his case. An error is prejudicial if, when viewing the record in its totallity, it has a substantial effect on the outcome of the case. Wallace v. Upjohn Company, 535 So.2d 1110 (La.App. 1st Cir.1988), writ denied, 539 So.2d 630 (La.1989). If the error involves evidence of a fact or facts that have already been proven, and thus is merely cumulative evidence, there may be no prejudicial error. Morrison v. J.A. Jones Construction Company, Inc., 537 So.2d 360 (La.App. 4th Cir.1988). In Carter v. Travelers Insurance Co., 535 So.2d 1001 (La. App. 2nd Cir.1988), writ denied, 536 So.2d 1202 (La.1989), the trial court erroneously allowed a state trooper, who had not been qualified as an expert, to give an opinion that the vehicle in question turned counterclosewise after impact. However, the expert reconstructionists who testified for the plaintiffs and the defendants both gave the same testimony as the trooper. The court found the error harmless. In the instant case the expert reconstructionist for the plaintiffs and the expert reconstructionist for the defendants both testified to the jury that McLaughlin was intoxicated and stated his intoxication was either 0.16 or 0.20 percent. When Dr. Maxwell and Chigoy testified, their testimony about McLaughlin's blood alcohol was merely cumulative of what had already been presented to the jury by expert reconstructionists. In this procedural posture, any error committed by admitting the blood alcohol test result into evidence was harmless.
For other examples of harmless error involving cumulative evidence, see Landry v. Melancon, 558 So.2d 1143 (La.App. 1st Cir.1989); Watson v. Church's Fried Chicken, Inc., 527 So.2d 979 (La.App. 4th Cir.), writ denied, 532 So.2d 135 (La.1988); John Lovell & Company v. Boudreaux, 451 So.2d 156 (La.App. 1st Cir. 1984); Stephens v. State, Department of Transportation and Development, 440 So.2d 920 (La.App. 2nd Cir. 1983), writ denied, 443 So.2d 1119 (La.1984); Prince v. Travelers Insurance Company, 320 So.2d 227 (La.App. 3rd Cir. 1975); Duplechin v. Pittsburgh Plate Glass Company, 265 So.2d 787 (La.App. 3rd Cir. 1972).
In Wells, five judges held the admission of the blood alcohol test result was error, but the error was harmless. Query: How is the Wells case distinguishable, if at all, from the instant case on the issue of harmless error?
[9] This measurement was apparently made by Boudreaux and appears on his scale drawing attached hereto as Appendix A. Trooper McGlothren measured the positions of the truck and the McLaughlin car as they related to the La. 1040 roadway and the Stein Road intersection and placed them in his police report. Trooper McGlothren's measurements were transposed by Boudreaux onto his scale drawing.
[10] This is the distance given on the Boudreaux drawing. In Trooper McGlothren's report he has the distance as 69 feet.
[11] Trooper McGlothren put in his report a speed of 55 miles per hour for the McLaughlin vehicle. At the trial he was questioned about this speed and he stated it was an estimated speed, based on the "damage on the vehicle and damage that I have seen to other vehicles", but he conceded the speed could have been higher.