LABORDE, Judge.
Initially, plaintiff sought a writ of certiora-ri as to the trial court’s denial of a Motion In Limine to exclude evidence concerning the blood alcohol level of decedent, Jay Ortego. This court granted the writ and reversed, docket no. 93-865, 7/15/93, holding the blood alcohol test inadmissible. The Louisiana Supreme Court granted writs, docket no. 93-CC-2251 (11/29/93), 629 So.2d 407(1) (La. 1993), and remanded this case to us for briefing on the issue of whether the trial court properly denied his motion in limine concerning the blood alcohol level of decedent, Jay Ortego. After further review, we reverse our original holding and affirm the decision of the trial court. The blood alcohol test is admissible at trial.
FACTS
On the evening of February 26, 1989, a pick-up truck had rolled over into the median between the northbound and southbound lanes on 1-49 near Opelousas. The accident was being investigated by the State Police, under the supervision of Trooper Michael Ardoin and Lieutenant Harold Guidry. The officers positioned their vehicles on the inside left lane, with Ardoin’s vehicle to the south and Guidry’s vehicle further north, closer to the wreck. Both state police vehicles had all of their emergency lights operating. Further, while investigating the accident, Guidry placed four flares on the highway, in addition to two flares which had been previously placed there by a passing truck driver.
After an ambulance departed with those injured in the previous wreck, Dane St. Cyr, a wrecker operator, began to clean up the debris from the wreck. Then he backed his tow truck, with a revolving amber light operating above the cab of the wrecker, up to the front of the pick-up truck, partially blocking the interstate. Guidry and Ardoin directed traffic to move to the right to avoid the wrecker. St. Cyr moved next to the rear of the wrecker to operate the controls which would lift the pick-up truck onto the wrecker.
At approximately 1:00 a.m., Jay Ortego was driving northbound on Interstate 49. Lt. Guidry noticed Ortego’s vehicle approaching. It did not slow down or move to the outside portion of the highway as the other vehicles had, but remained near the center line travelling at a high rate of speed. Trooper Ardoin used a flashlight to warn Ortego to move to the outside portion of the highway. Ortego broadsided St. Cyr’s wrecker.
Ortego died as a result of the massive injuries sustained in the collision. Having left no spouse or descendants, his parents brought this wrongful death and survival action under C.C. arts. 2315.1 and 2315.2. Named defendants were Trooper Michael Ardoin, Lt. Harold Guidry, and their employer, State of Louisiana (through the Office of State Police); Dane St. Cyr, wrecker operator; Roy Motors, Inc., wrecker owner; CIG-NA Insurance Co., insurer of wrecker.
Plaintiffs filed a Motion in Limine to exclude a blood alcohol test performed on a sample taken from Ortego by Dr. Randall Thiriot in the emergency room.
On July 14, 1993, the trial judge denied plaintiffs motion in limine as to the blood-alcohol test. Subsequently, plaintiffs applied for supervisory writs to this court. On July 15, 1993, this court reversed the trial court, finding the blood alcohol test results inadmissible at trial.
Defendants then applied for supervisory writs to the Louisiana Supreme Court. On November 29, 1993, the Supreme Court remanded the case to this court for briefing, opinion and oral argument.
The issue to be reconsidered is whether the trial court correctly ruled that the blood-alcohol test was admissible. Plaintiff raises four theories in his argument that the blood-alcohol test should be excluded on four grounds: first, the blood sample was improperly extracted from the decedent’s heart; second, the dated blood collection kits had expired; third, the lack of refrigeration of the sample may have allowed bacteria growth affecting the alcohol level in the sample; finally, there was a gap in the chain of possession that precludes the sample’s admission.
In their first argument, plaintiffs argue that the blood sample taken in the emergen- *651 ey room by Dr. Thiriot from the victim’s heart was tainted. Plaintiff claims that since the decedent died of massive crushing chest injuries, and suffered internal bleeding before death, the sample may not have come directly from the heart. Plaintiffs’ expert, Dr. George McCormick, theorized that the heart was probably not where it otherwise would have been, but had probably shifted to the right side of the chest cavity; thus, there is a strong possibility that the sample was contaminated from alcohol from ruptured organs within the chest or abdominal cavity, from ruptured or lacerated muscles along the walls of those cavities, or from alcohol or bacteria from the esophagus, stomach, small intestine, or from an open wound.
Plaintiffs’ second argument is that the expired blood collection kits did not constitute reliable evidence. The sample was placed into a Bectin-Dickinson collection kit bearing an expiration date of 4-15-87, while the sample was taken on 2-26-89. Plaintiffs’ expert McCormick testified that he has obtained a significant number of flawed results with expired B-D kits; in his experience, McCormick noted that expired kits yielded excessive readings from known samples.
In its third argument, plaintiffs claim the sample could be tainted from lack of refrigeration. McCormick testified that a blood sample contaminated with bacteria will produce alcohol if not refrigerated. He further explained that a sample can increase as much as .15 g/% alcohol after being left unrefrigerated overnight. Jerry Harrison of the state police crime lab testified that the blood sample was not refrigerated for five to six days before analysis. As a consequence, plaintiffs’ expert believes that the sample is contaminated and has no evidentiary value. Defendants’ expert, Jerry Harrison of the state police crime lab, testified that lack of refrigeration could only reduce the amount of alcohol in a sample.
Finally, Dr. Thiriot stated that he delivered the sample to a state trooper, although he cannot remember which trooper he delivered it to. Plaintiff claims this gap in the chain of evidence renders the blood alcohol sample and consequent test results inadmissible.
LAW
Regarding preliminary questions of admissibility, La.C.E. 104 provides as follows:
Art. 104. Preliminary questions
A. Questions of admissibility generally. Preliminary questions concerning the competency or qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court, subject to the provisions of Paragraph B. In making its determination it is not bound by the rules of evidence except those with respect to privileges.
B. Relevancy conditioned on fact.
Subject to other provisions of this Code, when the relevancy of evidence depends upon the fulfillment of a condition of fact, the court shall admit, it upon, or subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition.
When factual questions must be decided to determine the admissibility of the evidence, a question of law, the court should follow the preponderance of evidence standard, unless a special rule of law requires a different standard. See Comment (a), (c) for La.C.E. art. 104(A); McLaughlin v. Fireman’s Fund Ins. Co., 582 So.2d 203, 207 (La.App. 1 Cir.), writ denied, 586 So.2d 536 (La.1991). Further, Comment (f) explains that, under 104(B), the trial court should admit conditionally relevant evidence if preliminary evidence of the condition indicates that a rational juror could conclude that the condition exists or was fulfilled.
The question presented is whether the mode by which the blood sample was extracted is reliable. La.C.E. 901 provides as follows:
Art. 901. Requirement of authentication or identification
A. General provision. The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.
*652 B. Illustrations. By way of illustration only, and not by way of limitation, the following are examples of authentication or identification conforming with the requirements of this Article:
(1) Testimony of witness with knowledge. Testimony that a matter is what it is claimed to be.
Dr. Randall Thiriot, the emergency room physician who drew the sample, testified that the patient had trauma to the chest, and that the right side of the chest was most severely involved. He stated that he drew blood from the victim’s heart through a long needle. He did not open up the patient’s chest to retrieve this sample, but just inserted the needle directly through the skin to get blood from the heart. Thiriot stated that he was confident that the sample was taken from blood located in the heart because of the pressure he felt on the needle and because the blood was easy to withdraw in large volume. After taking the sample, he gave the kit to a waiting trooper.
Jerry Harrison, a toxicologist at the Louisiana State Police Crime Lab, testified from the records kept at the lab concerning handling of evidence, that on March 2, 1989, Lt. Frusha brought in the blood sample from Ortego, and that it was received by Patrick Lane. Harrison then described that the gas chromatograph is calibrated every day, that is known blood alcohol samples are tested, to make sure it "will render accurate results on an unknown sample. He tested the sample from Ortego on March 3,1989, and found the blood alcohol level to be .14 grams percent (per 100 milliliters of blood). He further stated that the samples are stored in the evidence room at room temperature until they are taken to be tested. He also stated that the B-D kit used to take the sample ordinarily contains sodium fluoride as an antibacterial agent, which preserves the blood until it can be tested. He further stated that the expiration date on the tubes in the B-D kit refers to the vacuum in the tubes; the vacuum is used to draw the blood through the needle into the tube. Harrison stated that when he picked up the B-D kit for testing it was sealed, indicating that the sample had not been tampered with prior to testing.
Experts called by each of the parties differed as to the validity of the results of the blood alcohol testing. Plaintiffs expert, Dr. George McCormick, II, a forensic pathologist, testified that the sample was improperly taken, since the blood may not have come directly from the heart, and may have been mixed together -with blood in the chest cavity from other ruptured organs. The CPR and chest compressions the victim received immediately after the accident may have caused some mixture of internal fluids. Further, he believed that expired B-D kits could not maintain their capacity to inhibit bacterial growth. Also, he stated that he had seen evidence of unrefrigerated samples without sodium fluoride that produced ethanol.
However, defendant’s expert, Dr. James Freeman, a clinical pathologist, stated that if the blood extracted was mixed with fluid in the chest cavity, the blood alcohol level would be falsely lowered. Further, if the heart, diaphragm and stomach all had been ruptured and the blood was mixed together, a blood sample would reveal an astronomical level of alcohol, which would be obvious to the person testing it. Concerning the B-D kits used to store blood samples, he stated that the expiration date has no scientific value, but only refers to the vacuum in the kits. He further stated that the sodium fluoride normally found in the kits is used for inhibiting metabolism; however, the presence of sodium fluoride would not make a great deal of difference since no metabolism will occur in the body after death, and alcohol absorption ceases at the moment of death.
Before blood alcohol test results can be admitted in a civil or criminal proceeding, the party seeking to introduce them must lay a proper foundation by connecting the specimen with its source, showing that it was properly labelled and preserved, properly transported for analysis, properly taken by an authorized person, and properly tested. Duplechain v. Old Hickory Cas. Ins. Co., 594 So.2d 995, 997 (La.App. 3 Cir.1992). The trial court found that defendants did satisfy their burden of proof and we find no error in that conclusion. Although the depositions of *653 Troopers Ardoin and Guidry were not admitted at the motion in limine (but have been proffered for the record) concerning transportation of the sample, the trial court judge stated in the record that no break in the chain of custody of the blood sample occurred, as the identifications on the vial serve to authenticate this sample. Dr. Thiriot testified about putting the blood samples in two separate vials, handing over the samples to a state trooper, and signing some paperwork to identify the samples. Jerry Harrison, the toxicologist that tested the sample, testified that a state trooper had delivered the samples, and that the seals on the kit had not been tampered with when he examined them before removal for testing. The trial court concluded that it was highly unlikely that the blood in the vial had been exchanged or tampered with.
Gaps in a chain of custody usually affect the weight of the evidence, not its admissibility, and an unbroken chain of custody is not essential for the admissibility of the evidence as long as the foundation shows it is more probable than not that the evidence tested was that which was originally taken. McLaughlin, supra, at 208. Any gaps in the chain of custody here will not affect the admissibility of the evidence, but will go to the weight of the evidence. Id.
CONCLUSION
The blood alcohol tests are admissible; any gaps in the chain of custody of the blood sample will go to the weight of the evidence, and not affect its admissibility.
DECREE
The trial court’s ruling that the blood alcohol testing is admissible is affirmed. Case is remanded to the trial court for further proceedings. Costs assessed to plaintiff-appellant.
AFFIRMED.